IN RE TRUSTEESHIP NO. 1924 OF ROBIN FREDERICK SCULLY. ROBIN FREDERICK SCULLY, APPELLEE, v. THOMAS A. SCULLY, APPELLANT.

76 N. W. 2d 239

Filed April 6, 1956. No. 33898.

*Cecil B. Brubaker, Emory P. Burnett,* and *Van Pelt, Marti & O'Gara,* for appellant.

*Cline, Williams, Wright & Johnson* and *Charles E. Oldfather,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff, Robin Frederick Scully, originally filed an application in the county court of Nuckolls County seeking an order directing defendant, Thomas A. Scully, to render and deliver to plaintiff the full possession, management, and control of his trust estate and terminate the trust. Plaintiff alleged that he was 30 years old on March 20, 1954, and, being possessed of experience, judgment, and prudence, was a fit and proper person to be entrusted with the full management and control of his estate and have the trust terminated as provided by the terms of his father's will, but that defendant, although duly requested so to do, had wrongfully and arbitrarily refused to terminate the trust. Plaintiff admitted that defendant as trustee had accounted to the county court for all receipts and disbursements to and including February 28, 1953, and expressly waived an accounting by defendant to and including that date.

Defendant's answer admitted that plaintiff was 30 years old on March 20, 1954, and that defendant as trustee had accounted to the county court for all receipts and disbursements to and including February 28, 1953, as alleged. Defendant then denied generally and alleged that great trust and discretion were vested in defendant by plaintiff's father, whose intention, as disclosed by his will, was that plaintiff should have the full management and control of his trust estate to-

gether with the accumulations thereof only when he was 35 years old, unless in the judgment and discretion of defendant the plaintiff had shown to the satisfaction of defendant that he possessed sufficient experience, judgment, and prudence as in the judgment of defendant rendered plaintiff a fit and proper person to be entrusted with the full possession, management, and control of his estate at an earlier date. Defendant alleged that plaintiff had not yet so shown to the satisfaction of defendant that he possessed such experience, judgment, and prudence. Defendant prayed for dismissal of plaintiff's application and recovery of his costs. Plaintiff's reply was a general denial.

After hearing upon the merits, the county court rendered judgment, finding and adjudging that defendant had not abused his discretion in refusing to terminate plaintiff's trust, and denied plaintiff's application. Thereupon plaintiff appealed to the district court where comparable pleadings were filed, and after hearing upon the merits the trial court rendered judgment. It found and adjudged that plaintiff was possessed of experience, judgment, and prudence rendering him a fit person to be entrusted with the full possession, management, and control of his estate, and that although defendant was not guilty of any fraudulent intent, he abused his power of discretion in refusing to terminate the trust. It then ordered defendant to immediately terminate plaintiff's trust, make an accounting to date of termination thereof, and pay out of the trust funds all costs in the county court and district court, together with reasonable fees to defendant's counsel for services rendered in his behalf. Such attorneys' fees were fixed at $10,000 at a subsequent hearing reserved for that purpose whereat evidence was adduced which does not appear in this record.

Subsequently, motions for new trial respectively filed by plaintiff and defendant were overruled. Thereupon defendant appealed, assigning some 13 reasons why

the judgment was erroneous, the effect of which was to assign that the findings and judgment ordering termination of the estate was not sustained by the evidence but was contrary thereto and contrary to law. Thereafter plaintiff cross-appealed, assigning that the trial court erred in finding and ordering that all costs, including reasonable attorneys' fees to defendant's counsel, should be paid out of the trust funds, and erred in fixing such fees at $10,000. We sustain defendant's assignments. We also conclude that the assignments in plaintiff's cross-appeal should not be sustained.

In that regard, this court has said: "The county court has original and exclusive jurisdiction in probate matters, which is conferred upon the district court in those matters appealed to it." In re Estate of Marsh, 145 Neb. 559, 17 N. W. 2d 471.

It is clear also that the county court or the district court on appeal ordinarily has discretionary power and authority to order payment of costs and in proper cases to order payment of reasonable fees to attorneys for services rendered a good faith trustee out of the trust estate in litigation such as that at bar, and such an award may be made either at time of trial in county court or in district court on appeal, or upon subsequent application made therefor. In re Estate of Linch, 139 Neb. 761, 298 N. W. 697; Linn v. Linn, 146 Neb. 666, 21 N. W. 2d 283; Annotation, 9 A. L. R. 2d 1132; 2 Scott on Trusts, § 188.4, p. 1005.

As recently as Hardy v. Hardy, 161 Neb. 175, 72 N. W. 2d 902, this court, quoting with approval from Hemmer v. Metropolitan Life Ins. Co., 133 Neb. 470, 276 N. W. 153, said: " 'A reasonable attorney fee in any proceeding is to be determined by the nature of the case, the amount involved in the controversy, the results obtained, and the services actually performed therein, including the length of time necessarily spent in the case, the care and diligence exhibited and the character and standing of the attorneys concerned.' "

Also, as said in Reed v. Ringsby, 156 Neb. 33, 54 N. W. 2d 318: "We find no evidence as to the value of the services. Apparently the matter was left to the discretion of the trial court. The court exercised it. We see no reason for finding that the determination was unreasonable." Such statement has particular application here where the record discloses: "And on this same day in pursuance to said stipulation this matter came on for hearing as to the taxing of attorneys' fees on behalf of the trustee. Evidence is introduced and the matter is taken under adivsement (advisement). * * * The court further finds that the motion for new trial filed by the plaintiff on the 28th day of June 1955 relative to the allowance of any attorney's fees to defendant's attorneys out of the trust estate should be and the same is hereby overruled.

"The court further finds that the trustee should pay to his attorneys for their services rendered in the county court and in the district court in this matter the sum of $10,000, in addition to all the costs incurred in the trial of this matter both in the county court and in this court, from the funds held in the hands of the trustee." We find no merit in plaintiff's contention with regard to the allowance and payment of costs and attorney fees.

It is elementary that appeal to this court in an equity action such as that at bar is heard de novo upon the record.

In 54 Am. Jur., Trusts, § 604, p. 467, it is said: "The burden of proving the termination of a trust, where the trust is proved or admitted and its termination is asserted, is on the party making such assertion, and where an effort is made to terminate a trust because its purposes are not being carried out as the testator or settlor directed, the burden of proving such noncompliance by clear evidence is on the moving party." Although not discussed in direct language, it is clear that such burden of proof was imposed upon plaintiff

by this court in Patterson v. Lanning, 62 Neb. 634, 87 N. W. 338.

As stated in Annotation, 32 A. L. R. 441: "In order to justify the interference of the court the beneficiary must establish by proof of the clearest character that the refusal of the trustee to act was unreasonable." Such rule cited Morton v. Southgate, 28 Me. 41, wherein the court said: "The testator contemplated a time, when the property should be transferred, but the proper time involves a matter of judgment, confided solely to the trustee. But if the Court possessed the power, to direct a transfer, the exercise of it could only be justified, where the transfer was delayed, for reasons clearly unsubstantial and unjustifiable. The proof, to overrule the discretion, should be of the fullest and clearest character." Such rule was followed in Watling v. Watling, 27 F. 2d 193, where it is said: "But a court ought not to overrule the trustee's discretion, except upon the clearest of proof; that is, proof that it has not exercised a good faith discretion."

As stated in Cleveland Clinic Foundation v. Humphrys, 97 F. 2d 849: "The discretionary power vested in a trustee will not be disturbed by the Court in the absence of bad faith or fraud. Colton v. Colton, 127 U. S. 300, 322, 8 S. Ct. 1164, 32 L. Ed. 138."

In Roats v. Roats, 128 Neb. 194, 258 N. W. 264, this court held that: "The primary rule in the construction of trusts is that the court must, if possible, ascertain the intention of the creator of the trust.

"Courts are always reluctant to interfere with the exercise of a discretion lodged in a trustee.

"Courts of equity may, however, intervene in behalf of a beneficiary if the evidence discloses that a trustee's denial of the relief sought might be influenced by self-interest."

As stated in In re Moir Hotel Co., 186 F. 2d 377: " 'But the court will exercise this prerogative with great caution, and will not displace the trustee from exer-

cising his functions unless, upon a consideration of the reasons and grounds upon which he has acted, it appears that he has abused his trust and that his acts in the premises have not been within the limits of a sound and honest execution of the trust.' "

In In re Will of Sullivan, 144 Neb. 36, 12 N. W. 2d 148, this court held: "The extent of the discretion conferred upon a trustee is measured by the settlor's manifestation of intention."

In In re Estate of Vohland, 135 Neb. 77, 280 N. W. 241, this court held: "The manner in which a trustee shall exercise his function rests ordinarily within his own discretion and judgment. If he exceeds his powers, acts negligently, or abuses his discretion, courts can grant relief.

"The mere fact that, if the discretion had been conferred upon the court, the court would have exercised the power differently is not ordinarily a sufficient reason for interfering with the exercise of power by the trustee."

In Reed v. Ringsby, *supra*, this court held: "Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion." See, also, Restatement, Trusts, § 187, p. 479.

As stated in Restatement, Trusts, § 187, comment e, p. 481: "If discretion is conferred upon the trustee in the exercise of a power, the court will not interfere unless the trustee in exercising or failing to exercise the power acts dishonestly, or with an improper even though not a dishonest motive, or fails to use his judgment, or acts beyond the bounds of a reasonable judgment." See, also, Annotation, 143 A. L. R. 468; 54 Am. Jur., Trusts, § 181, p. 143.

Also, as said in Restatement, Trusts, § 187, comment d, p. 480: "In determining the question whether the trustee is guilty of an abuse of discretion in exercising

or failing to exercise a power, the following circumstances may be relevant: (1) the extent of the discretion intended to be conferred upon the trustee by the terms of the trust; (2) the purposes of the trust; (3) the nature of the power; (4) the existence or non-existence, the definiteness or indefiniteness, of an external standard by which the reasonableness of the trustee's conduct can be judged; (5) the motives of the trustee in exercising or refraining from exercising the power; (6) the existence or non-existence of an interest in the trustee conflicting with that of the beneficiaries."

This court has held that: "In the matter of control of discretionary powers of a trustee, the real question is whether it appears that the trustee is acting in that state of mind in which it was contemplated by the settlor that he should act." Reed v. Ringsby, *supra.*

As stated in Restatement, Trusts, § 334, comment d, p. 1013: "By the terms of the trust the trustee may be given a discretionary power to terminate the trust in whole or in part. In such a case the exercise of the power is not subject to the control of the court, except to prevent an abuse by the trustee of his discretion (see § 187).

"Whether the trustee can properly consent to the termination of the trust and whether he is under a duty to consent to its termination depend upon the extent of the discretion conferred upon the trustee by the terms of the trust.

"If there is a standard by which the reasonableness of the trustee's judgment can be tested, the court will control the trustee in the exercise of the power where he acts beyond the bounds of a reasonable judgment, unless it is otherwise provided by the terms of the trust.

"If the trustee is guilty of an abuse of discretion in not terminating the trust, the court will direct the termination of the trust. Thus, if the trustee is directed to terminate the trust by transferring the trust property to the beneficiary if in the opinion of the trustee the

beneficiary is competent to manage the property, the beneficiary can compel the trustee to transfer the trust property to him if he shows so clearly that he is competent to manage the property that it would be an abuse of discretion for the trustee to refuse to transfer it to him. * * *

"If there is no standard by which the reasonableness of the trustee's judgment can be tested, the court will not control the trustee in the exercise of his power to terminate the trust if he acts honestly and does not act from an improper motive."

Finally, in 2 Scott on Trusts, § 187.2, p. 994, it is said: "There are cases in which the trustee is directed to pay the principal of the trust estate to a beneficiary if the trustee is satisfied that the beneficiary is * * * competent to manage the property. In these cases, if the trustee refuses to pay the trust fund to him although it clearly appears that the beneficiary has fulfilled the conditions specified by the settlor, the trustee can be compelled by the court to pay it to him. If, however, there is room for doubt whether the beneficiary has complied with the conditions, so that a reasonable person might believe and the trustee honestly believes that he has failed to comply with them, the court will not interfere with the exercise by the trustee of the discretion conferred upon him."

In the light of such applicable and controlling rules, we have examined the record. It is voluminous and we can only summarize pertinent parts thereof, which fairly disclose the following: A vast estate, consisting of many thousand acres of land in Illinois, Missouri, Kansas, Louisiana, and Nebraska, together with personal property worth several million dollars, was largely accumulated by William Scully, the father of defendant Thomas A. Scully, Frederick Scully, and Angelita Scully. When William Scully died in 1906, all of his property either went to his widow or had been previously transferred to her during his lifetime. Following his death, defend-

ant and Frederick Scully managed the lands and other property owned by their mother, William Scully's widow. They lived in Lincoln, Illinois, where, in 1907, their mother built an office building for their use, which was purchased by defendant and Frederick Scully in 1920 for $30,000. Each owned an undivided one-half interest therein. There they worked together and maintained an exceedingly close family and business relationship throughout their lives. Following their father's death, their mother distributed many bonds and large acreages of land to the two sons and gave their sister an equivalent in bonds. Lands owned by Frederick Scully included 60,000 acres in Kansas, 28,000 acres in Louisiana, and 56,768.48 acres in Nebraska, of which 22,815 acres were in Gage County and 33,953.48 acres were in Nuckolls County.

Frederick Scully, who was the father of plaintiff and plaintiff's brother, also named William Scully, died testate in October 1942. His wife, mother of plaintiff and William, died testate in September 1942. Plaintiff was born March 20, 1924, and became 30 years old March 20, 1954. His older brother William was born November 8, 1922, and became 30 years old November 8, 1952.

Their father's will, executed in 1936, was probated in Nuckolls County under ancillary proceedings. The first five paragraphs of his will provided for payment of debts and funeral expenses and made a number of specific devises and bequests which are of no importance here except that in paragraph Fourth he made a specific bequest to defendant as follows: "To my brother, Thomas A. Scully in appreciation of our close business and family relationship, I give and bequeath the sum of Fifty thousand dollars ($50,000.00)."

Paragraph Sixth devised all real estate owned by testator in Kansas, some 60,000 acres, to William, subject to trust. Paragraph Seventh devised all real estate owned by testator in Gage and Nuckolls Counties, Nebraska, some 56,768.48 acres, to plaintiff, subject to trust.

Paragraph Eighth devised all real estate owned by testator in Louisiana, some 28,000 acres, to plaintiff and William in equal shares, subject to trust. Paragraph Ninth devised testator's undivided one-half interest in the office building in Lincoln, Illinois, and all his real estate in Logan County, Illinois, to plaintiff and William in equal shares, subject to trust. Paragraph Tenth devised testator's undivided interest in a residence property and all real estate owned by him in Washington, D. C., to plaintiff and William as tenants in common, subject to trust. Paragraph Eleventh devised and bequeathed all of testator's vast amount of personal property of every kind and character and wheresoever situated in the United States, to plaintiff and William in equal shares, subject to trust.

Under Louisiana law, the trust provision could not be given effect insofar as it applied to lands located in that state, so at termination of executorship, such lands were turned over to plaintiff and William.

Paragraph Twelfth of testator's will then expressly appointed and constituted his brother, defendant herein, testamentary guardian and trustee for plaintiff and William, "to hold, manage and control all of the estate, real, personal and mixed hereinbefore devised or bequeathed" to them "with full power and authority to manage and control the same for the use and benefit of my said sons and to collect all rents, dividends, profits and income therefrom and to invest and reinvest the same from time to time and to collect, if called for redemption, bonds and securities so held and invest the proceeds thereof in securities suitable and proper for investment in his discretion and to sell and convert into money bonds and securities herein devised and bequeathed or hereafter purchased which in his discretion he may deem unsuitable for holding and to pay therefrom all debts, expenses and charges necessary and proper in the management and control of said property and to employ agents in the management of said real

estate as I have done in the management thereof and to maintain in connection with himself a head office at Lincoln, Illinois or elsewhere as he and I have done and to prorate the expenses thereof in the proportion in which he and I have prorated the same and to carry on said business in general in the manner in which I have carried on the same and after payment of all expenses and charges and costs incident thereto, including attorney fees for services rendered and to be rendered, to pay said sums so collected and rents, income, dividends and profits so received to my said sons the following amounts to-wit; To each of my said sons when he shall arrive at the age of twenty-one (21) years, the sum of Five thousand dollars ($5000.00) per annum;

"To each of my said sons when he shall have arrived at the age of twenty-five (25) years, the sum of Fifteen thousand dollars ($15,000.00) per annum;

"To each of my said sons when he shall have arrived at the age of thirty (30) years the sum of Twenty-five thousand dollars ($25,000.00) per annum;

"To each of my said sons when he shall have reached the age of thirty-five (35) years the full management, control and possession of the estate and property herein devised and bequeathed to such son together with the accumulation thereof.

"I do, however, hereby expressly provide and it is my will that if each or either of my said sons when he shall have reached the age of thirty (30) years shall have shown to the satisfaction of the said guardian and testamentary trustee in this will designated and appointed, that he, my said son, is possessed of experience, judgment and prudence such as in the judgment of the said testamentary guardian and trustee renders my said son, so having reached the age of thirty (30) years, a fit and proper person to be entrusted with the full management and control of his said estate in this will to him devised and bequeathed, then and in such event the said testamentary trustee shall in such exercise of

his discretion as aforesaid, render and deliver over unto him, my said son, the full possession, management and control of the estate so to him devised and bequeathed, and as to him, my said son, to whom such estate is so then rendered over and delivered the said trust shall cease and determine. * * * In the event my said brother, Thomas A. Scully, shall die or otherwise fail to serve and act as hereinbefore specified and provided, I constitute and appoint John C. Scully of Peoria, Illinois as successor and testamentary guardian and trustee with all the rights, powers and duties vested and reposed in my said brother, Thomas A. Scully." In that connection, John C. Scully was a cousin of defendant and testator.

Paragraph Thirteenth provided: "Realizing that the lapse of time for which the term of the above created trust is to continue and in view of the extent and amount of the said trust estate in lands and bonds, and realizing that it is difficult to foresee what changes in circumstances may render necessary or advisable the sale and conveyance of lands and the change of form in securities constituting any part in said trust estate, I do hereby expressly provide and direct that the said testamentary guardian and trustee, for my said sons appointed, may when either of my said sons shall have reached the age of twenty-one (21) years, with the consent in writing of such son, sell, transfer and convey the said real estate to such son so devised and bequeathed or any part or parts thereof from time to time at such sum as in his judgment and with the written consent of such, my said son, they shall deem reasonable and proper and to enter into all contracts and instruments in connection therewith and to make such sale upon such terms of credit as he, the said testamentary guardian and trustee, and such son, shall deem reasonable and proper and to take mortgages or other first lien securities upon the lands conveyed for the payment thereof and to release and discharge the same when

paid and to invest the proceeds thereof in bonds or real estate situated in the United States of America or elsewhere as the said testamentary guardian and trustee and my said son whose lands so to him devised are then sold and transferred and conveyed and to re-sell and re-convey such real estate so purchased and received as in the judgment of said testamentary guardian and trustee and with the written consent of my said son shall be deemed reasonable and proper. The said power in this paragraph of my will created is based upon a personal trust in the said testamentary guardian and trustee and shall not be exercised by any successor in trust except the said John C. Scully, if he shall succeed the said testamentary guardian and trustee, Thomas A. Scully, in the administration of said guardianship and trust."

Paragraph Fourteenth provided: "I hereby specifically provide that the compensation of said testamentary guardian and trustee shall not exceed the sum of Twenty-five hundred dollars ($2500.00) per annum."

Paragraph Fifteenth nominated, constituted, and appointed Thomas A. Scully, John C. Scully, and William E. Trapp, as executors of testator's estate and directed that no bond should be required of them other than their personal obligation. They qualified and served as such without bond.

Notwithstanding the vastness of the Frederick Scully estate and the established Scully policy of never mortgaging and only selling their lands when they could not be operated profitably, proceedings were had in the district court for Nuckolls County by the executors to sell Nebraska real estate in order to pay debts, inheritance taxes, and expenses of administration. In that respect, Frederick Scully died seized of stocks, bonds, securities, bank deposits, and other personal property appraised at $3,874,696.63, but owed debts and inheritance taxes amounting to $5,580,789. Although license to sell issued, such case was later dismissed when the obliga-

tions were met. In doing so, plaintiff and William each personally advanced $67,453.14, a substantial amount of which was subsequently reimbursed to them, and defendant herein entirely renounced his $50,000 legacy which was used in order to assist plaintiff and William in the preservation of their estates.

By final decree, the county court formally set up plaintiff's trust in the county court and ordered that upon acceptance and filing his oath as guardian and trustee without any bond being required, the possession, control, and management of all plaintiff's trust estate should be vested in defendant, and in the event of his death or disability to act, it should vest in his successor, John C. Scully, together with all the powers, duties, obligations, discretion, and authority specified in paragraphs Twelfth, Thirteenth, and Fourteenth of the last will of Frederick Scully, deceased. Thereafter, defendant so qualified, and on September 19, 1944, letters of trusteeship were duly issued to him and he has since continued to serve in such capacity. In that regard, it will be noted that defendant never was trustee of the estate devised and bequeathed in trust to plaintiff's brother William. John C. Scully was appointed and acted in that capacity. Being in such precarious health that he could no longer act as trustee, John C. Scully terminated that trust on December 23, 1952, after William became 30 years old.

On March 22, 1954, just 2 days after plaintiff became 30 years old, he wrote defendant expressing the wish that defendant would favorably consider turning over the estate to plaintiff so that he could undertake personal management of it. In such letter plaintiff thanked defendant for his counsel and advice already given and to be given in the future, and offered to undertake to obtain an agreement with William to sell defendant their one-half interest in the office building in Lincoln, Illinois, for a flat sum of $30,000, when plaintiff's trust had been terminated. Such sale would have paid de-

fendant and William each $15,000 for their respective interests. Also, subsequently on December 13, 1954, about 1 month before this action was tried and after William had purchased the office building for $51,000 at partition sale, William proposed to sell the building to defendant for that price and end all litigation, but only if defendant would promptly terminate plaintiff's trust.

In the meantime, on March 25, 1954, defendant acknowledged receipt of plaintiff's letter, suggesting that defendant resign as trustee and that plaintiff and William might sell defendant their one-half interest in such building for $30,000 when plaintiff's trust was terminated. Defendant called plaintiff's attention to the fact that the building, constructed in 1907, had been purchased in 1920 for $30,000; that, being 34 years older, it was showing many signs of age; and he would be willing to pay $15,000 for their one-half interest. He also said that he would consider the matter of resigning as trustee.

On April 6, 1954, plaintiff answered, stating that a total valuation of $60,000 for the building was the absolute minimum that he would consider and that unless defendant offered $15,000 to each for their interest, William would bring partition. Plaintiff then inquired how soon he could expect to receive defendant's decision about termination of the trust.

Thereafter, on April 21, 1954, without waiting for an answer to that letter, plaintiff filed this action wherein defendant testified that he did not terminate the trust when plaintiff became 30 years old or since because from things plaintiff had done and recommended to be done he had not shown to the satisfaction of defendant that plaintiff was yet possessed of experience, judgment, and prudence such as in defendant's judgment rendered plaintiff a fit and proper person to be entrusted with the full management and control of the vast estate devised to him by the will of his father.

The record discloses that in the fall of 1942 plaintiff entered Harvard University as a freshman. Later he entered the naval V-12 program but was separated therefrom in the fall of 1943 by disciplinary action. Following that time, plaintiff became a seaman in the navy and was discharged in the fall of 1945. In 1946 he came to Nebraska at the suggestion of defendant for the purpose of familiarizing himself with the trust properties and their manner of operation by the respective agents of defendant in Gage and Nuckolls Counties. Plaintiff testified that he had lived at the Paddock Hotel across the street from their agency office in Beatrice since that time. However, he admitted that his income tax returns all gave Lincoln, Illinois, as his residence and that his room at the Paddock Hotel was given up whenever he was away from Beatrice. In that regard, plaintiff was away about 3 months on vacation in England, where he had some race horses, during each summer from June until sometime in September, and when he was down in Louisiana about 2 or 3 months each fall, where during the last 4 or 5 years he had maintained a permanent apartment in New Orleans about 50 miles from the Louisiana lands. There also plaintiff and William maintained a rental agent and business office. There was ample competent evidence that because of urgent personal and business necessities that did and might arise, plaintiff was repeatedly requested by defendant to give him a definite mail or telegraph address while he was away from Beatrice, but plaintiff failed to do so.

Plaintiff testified with regard to his growing familiarity with the properties, his study with relation to farm crops, his participation in soil conservation activities and hiring of employees, his membership in several agricultural organizations, and his attendance at a short course at the College of Agriculture at the University of Nebraska in 1947, where he took three subjects but failed in one called "Feeds and Feeding,"

and could not recall whether or not his grades in the other two subjects were a low 70 or a high 60. Plaintiff also related that from time to time he had made suggestions for changes in lease forms, some of which had been adopted, and that he knew in a general way about farm rentals charged and collected by defendant and his agents. Defendant's agent in Gage County, who testified as a witness for plaintiff, verified such activities and said that plaintiff had "assisted nearly in every way that you would in the management field."

In that regard, what is known as the traditional "Scully system" of leasing and managing Scully farm lands was originally instituted by plaintiff's grandfather and continued by defendant and plaintiff's father with profitable returns. Such leases are ordinarily based upon an annual cash rental for 20 percent or less of gross production, with only year-to-year leases by tenants who own all improvements and are encouraged to remain on Scully land. Their tenants seldom if ever moved off the land. Rents were not fixed by defendant alone or based solely on crop experience for the immediately preceding year, but rather by local inspection and consultation with his agents and tenants. Plaintiff was usually present after 1946 and made constant efforts to raise rents, which, together with other reasons hereinafter discussed, led defendant to believe that plaintiff did not have the required experience, judgment, and prudence. For example, plaintiff suggested a 25 percent rental raise in Nuckolls County for 1953, then later reduced his suggestion to a 10 or 15 percent raise, which defendant, having had many years of experience in Gage and Nuckolls Counties since 1897, considered "entirely wrong" or "very unjustified," and no change was made. The related evidence justified that conclusion. In that respect, the Nuckolls County lands actually paid 35 percent rentals in 1953. The record also discloses that plaintiff could not remember the actual number of acres belonging to his

estate in either Gage or Nuckolls Counties, and that the maximum time spent by plaintiff in Nuckolls County in any one year was 13 days in 1947 and the minimum spent there was 3 days in 1954. All together, plaintiff spent only a total of 62 days in Nuckolls County during a period of 9 years, and 29 days of that time were during October in conjunction with annual inspections made by defendant.

In 1947 plaintiff purchased 80 acres of land near Beatrice for $8,000. It had no improvements upon it except some fencing and soil conservation placed there by plaintiff. It had been previously leased, but at time of trial plaintiff had not yet leased it for the 1955 crop year. In the fall of 1947 plaintiff proposed that defendant should build a house upon it at expense of the trust. However,[1] defendant advised plaintiff that he should take the responsibility and pay for the cost out of his own ample private resources. Defendant also counseled and advised plaintiff in detail with regard to contractual employment of an architect and the obtaining of a proper performance bond. However, plaintiff did not assume such responsibility.

Plaintiff purchased an Adams patrol for $3,000, which was first used for conservation purposes in 1951. He was reimbursed therefor by defendant, but such patrol was defective and difficulty of maintenance followed, so plaintiff traded it and $8,000 cash for a Caterpillar patrol for which he was reimbursed by defendant. Plaintiff then purchased a concrete block garage in Beatrice for $8,000 in which to store the machinery. In the fall of 1950 plaintiff and William also purchased an office building in Beatrice, paying therefor in excess of $51,000 which defendant thought was too high a price. Thereafter plaintiff and William had offices in the building and defendant's Gage County agent became a tenant therein.

Plaintiff and William each owned an undivided one-half interest in the 28,000 acres of land in Louisiana.

It was generally designated as the Clovely farm. It was mostly swamp land except about 2,000 acres which had been reclaimed by their father. The principal crop was sugar cane. Commencing in 1946 plaintiff and William jointly operated the property until March 1949, when plaintiff leased his interest to William because the project lost money the preceding year. William then operated the land alone for 2 years but because of possible recall into military service he discontinued the operation, and they leased that land to the Valentine Sugar Company which still holds the lease. Some of the land is also leased for trapping purposes and an agent is employed to look after the leases. They also maintain an office there. The land is located in a large oil area and as a result of negotiations plaintiff and William formed a corporation to which all mineral rights thereon were transferred. They then sold second preferred stock in such corporation to the Superior Oil Company for one million dollars, plaintiff's share being $500,000. In 1951 they purchased an over-riding royalty interest in other oil properties in Louisiana for $80,000 which had been paying an income of about $12,000 or $13,000 a year. It was reasonable to believe that plaintiff's engagement in such oil transactions would not qualify him to engage in the management of his vast agricultural estate, and it will be noted that his agricultural experiment in Louisiana failed despite William's assistance therewith.

In that connection, in 1941 after the execution of his will, plaintiff's father gave him $1,000,000 in municipal and other bonds, and at time of trial plaintiff held approximately $1,160,000 of comparable securities. However, concededly such funds had been mingled with plaintiff's other funds which formed a part of that accumulation. In other words, the record does not show any accounting for plaintiff's $500,000 oil profit or his annual income from his oil or other transactions. In such respect plaintiff was very uncommunicative

with defendant and did not keep him informed of his business affairs other than those directly related to the trust.

Defendant testified in detail with reference to reasons why he had not terminated plaintiff's trust. Among such reasons was plaintiff's conduct while a V-12 student at Harvard, his continued absences from Nebraska while on trips to England or Louisiana and elsewhere without keeping defendant informed of his whereabouts, and his constant efforts to raise rents, which have been heretofore discussed.

Another reason was plaintiff's recommendations in 1950 that the following managerial steps should be taken by defendant, all of which defendant refused to do: First, plaintiff insisted that defendant's Nuckolls County agent, Mr. Hawley, should be retired because he was "entirely too old to be effective." In that regard, the record discloses without dispute that such agent was "an expert * * * very active * * * one of the very best agents that the Scullys ever had" and "a most excellent agent," having been continued in Scully employment from 1897 or 1898. Without dispute in 1950 he was thoroughly able and did carry on his work until his death in February 1951. In such respect it was reasonable to believe that the emotions of youth conflicted with the experience and wisdom of age.

Next, plaintiff insisted that Mr. Svendsen, who had been Mr. Hawley's assistant since June 1945, should be dismissed at the end of the fiscal year because plaintiff had "no confidence in" his "ability * * * to carry out an improved agricultural program" and was "no person to handle the management of a 45,000 acre agricultural estate." In that regard, the record discloses that Mr. Svendsen was and is a "thoroughly competent" employee. Therefore, he was not dismissed, but succeeded Mr. Hawley and has since continued to serve efficiently as Nuckolls County agent.

Next, plaintiff objected to the hiring of a Mr. Long whom Hawley and Svendsen wished to employ. Despite plaintiff's objections, defendant employed Long, relying entirely upon the recommendation of Hawley who "was an expert." Long is still employed and is "A very competent employee in conservation work and anything else to do with the estate." After he was employed plaintiff notified defendant that Long appeared to "be doing a fine job on waterways and soil conservation." At the trial plaintiff testified that he was "generally satisfied" with Long "as an employee;" and that "he had been doing a good job so far as the trustee" and his "interests are concerned."

Next, plaintiff insisted, without giving any reason, that the Nuckolls County office should be removed from Nelson, the county seat where it had been located for almost 80 years, to Superior, some 13 miles distant. At the trial plaintiff testified that he desired to so move the office because some employees he wanted to hire preferred to live in Superior where they had a good hotel, more attractive schools, a hospital, and better banks. However, defendant was certain that the office should remain at Nelson because it was the county seat, and there it remained.

In the fall of 1952 plaintiff, defendant, and Svendsen went on an inspection trip through Nuckolls County. It appears that plaintiff had ordered Svendsen to do some conservation work on other lands devised in trust to plaintiff by his mother, Betty Scully. Upon discovering that the work for some reason had not yet been done, plaintiff became "exceedingly incensed * * * completely lost his temper" and "apparently enraged * * * immensely * * * gave Mr. Svendsen a very thorough word slanging or whatever you would like to call it. It was a very unpleasant situation indeed." Defendant "didn't consider" that was "the way to talk to an agent at all" and stated that the aforesaid incidents were some reasons why he concluded that plaintiff was not

possessed of the required experience, judgment, and prudence.

Defendant gave as another reason for such conclusion that plaintiff had never yet married or settled down with some permanent home instead of living in a single room taken from day to day in the Paddock Hotel. In that connection, plaintiff's brother William was married and lived in Lincoln where he maintained a home for his wife and children who attended school there.

Upon cross-examination of defendant, plaintiff developed evidence upon two situations in an attempt to establish that defendant acted arbitrarily and with an improper motive when he refused to terminate plaintiff's trust. With regard to such situations, we are impressed at the outset with the fact that defendant without dispute was a multimillionaire in his own right; that he could never receive more than $2,500 in any one year as compensation for managing plaintiff's vast estate; and that defendant entirely renounced his own $50,000 legacy for the benefit of plaintiff and William in order to preserve their estates in which defendant had no remainder interest whatever. In such a situation it could not reasonably be concluded that defendant acted dishonestly or had any improper motive or selfish interest.

The first factual situation relied upon by plaintiff involved the proposed purchase by defendant and sale to him by plaintiff and William of their one-half interest in the office building in Lincoln, Illinois, where for almost half a century defendant and plaintiff's father had their offices and had managed all of their vast acres of land and personal property affairs, including the lands and personal property here involved. Concededly, plaintiff and William never had any desire to retain their interest in the building. Defendant, for sentimental reasons and to avoid sorting and rearranging a voluminous amount of papers and documents which had ac-

cumulated over a period of more than 100 years, and to avoid moving their three large safes, many files, furniture, and offices, offered to purchase their one-half interest. Several letters with relation thereto appear in the record showing negotiations over a period of time beginning on January 13, 1951. At that time defendant wrote plaintiff suggesting purchase of their one-half interest in the building upon the basis of a disinterested appraisal if agreeable. On January 23, 1951, plaintiff answered saying that after talking with William he had decided that he would probably be willing to sell if he knew what a fair market value of his interest was before he decided. He also inquired whether defendant, being trustee, could get good title thereto in Illinois. He suggested that defendant check that question before proceeding, and said that any agreement that defendant and John C. Scully might make with regard to appraisal could form a possible basis for settlement. On January 26, 1951, defendant replied with regard to the question of legality, designated it as a matter of small importance, suggested that on the basis of a disinterested appraisal for federal inheritance tax purposes made in 1942 the interest of plaintiff and William in the building, then some 43 years old, would be about $3,750 each. Defendant did not offer to pay such amount, but only requested a reply at plaintiff's convenience. On October 18, 1952, not having received any reply, defendant wrote plaintiff suggesting that both plaintiff and William should write him a definite letter without delay telling him whether or not they would sell their interest in the building at a fair and reasonable price because the matter of their small interests had then been delayed no less than 1 year and 9 months and it was time something was done about it. Again, on November 8, 1952, defendant wrote plaintiff suggesting that he had received no reply to his letter of October 18 and he would wait until November 11 and no longer in dealing with the matter. However, again

on December 9, 1952, defendant wrote plaintiff, enclosing an appraisal of the building for $38,000, made by two disinterested appraisers, and requested decision on whether or not plaintiff and William were willing to sell. On December 17, 1952, plaintiff replied, acknowledging receipt of defendant's letter enclosing the appraisal, and suggesting that he had talked with William who pointed out that defendant's letter did not in any way constitute an offer to buy. Plaintiff said that William thought the building was worth $100,000, and suggested a partition suit, but plaintiff might be able to get William to agree upon a vaulation of $80,000. On December 24, 1952, defendant answered plaintiff's letter saying: "In view of the fact that there appeared to be such a large difference in Williams, your and my opinion as to the fair value of this building, I think it best to drop the matter." No further effort was initiated by defendant thereafter to make the purchase.

We have heretofore discussed plaintiff's March 22, 1954, letter to defendant offering to sell their one-half interest for $30,000 when defendant terminated his trust, and William's proposition made December 13, 1954, about 1 month before this case was tried, to sell defendant the building for $51,000 and end all litigation, but only if defendant would promptly terminate plaintiff's trust. The reasonable inference from such evidence is that plaintiff and William postponed the matter of sale of the building to defendant until plaintiff became 30 years old for the purpose of inducing or tempting defendant to terminate plaintiff's trust despite any exercise of discretion. To the credit of the trustee, he rejected such offers. Instead of reflecting upon him, it firmly established his stature and integrity. If he had accepted such offers, he would have been derelict in duty. He would have been motivated by his own selfish interest and would not have been acting in the state of mind in which testator contemplated that he should act. Further, defendant took the position at all times that pur-

chase of plaintiff's and William's interest in the building was a comparatively small matter and testified that his failure to purchase the building did not influence his action with reference to termination of plaintiff's trust and had "nothing to do with it at all"; and that he had no "personal feelings or enmity toward" plaintiff, his "brother's son," for whom he cared as much as "at any time in the past."

The second situation relied upon by plaintiff involved the management of the Betty Scully land. Prior to his death, plaintiff's father deeded some 1,521.77 acres of land in Gage County, 6,667.40 acres in Nuckolls County, and 400 acres in Marshall County, Kansas, to plaintiff's mother, Betty Scully, who by her will duly probated bequeathed all of her personal property to plaintiff and William equally and devised such land to named trustees to be held in trust for the benefit of plaintiff and William in equal shares until they became 30 years old, when it should be divided between them and the trust should terminate. Such trust was terminated on March 20, 1954, when plaintiff became 30 years old. William E. Trapp and F. W. Ryan were trustees thereof. Both were long-time agents of plaintiff's father and defendant in Lincoln, Illinois. For a number of years such trustees managed the Betty Scully trust out of defendant's office, employing the same Gage and Nuckolls County agents as were employed by defendant. During each of the years while such joint operation continued, the Frederick Scully trust accounts received sizeable sums from the Betty Scully trust representing reimbursement for expenses incurred which were actually chargeable to the Betty Scully trust. Such joint operation was discontinued by direction of defendant effective the last day of February 1953. At that time John C. Scully had already terminated William's trust, and neither Ryan nor Trapp were any longer employed by defendant. Ryan had previously retired on September 30, 1951, because of ill health, and Trapp had pre-

viously retired on May 31, 1952, because of advanced age and ill health. In that regard, defendant testified that he had permitted the joint operation for several years "in order to help William and Robin along" but wanted to discontinue it when he found "that things were not going on so well and the accounts were getting complicated." There was "considerable complication of accounts" because they were all included in the same books as his own accounts in Lincoln, Illinois. Defendant testified that his failure to purchase the office building, heretofore discussed, had no influence or relationship whatever to his termination of such joint operation. We conclude that under the circumstances defendant had logical reason for so doing, and that such action could not be reasonably held to have any controlling relation to defendant's failure to terminate plaintiff's trust.

On rebuttal plaintiff testified that for each year ending in February 1950, 1951, and 1952, defendant had paid him in excess of $5,000. Some of it was paid for salary, but most of it was paid for travel expenses in connection with operation of his trust. In such respect, plaintiff complained that defendant had paid him nothing whatever for 1953 and 1954 although plaintiff had continued to do about the same kind of work. However, plaintiff admitted that such payments were to be made only after he had furnished statements therefor to defendant, which plaintiff had failed to do for any of such later years. Clearly, defendant could not be blamed for that situation, and we conclude that it had no relationship whatever to defendant's failure to terminate plaintiff's trust. Rather, it reasonably disclosed that plaintiff had failed to properly take care of his own business.

We conclude that plaintiff clearly failed to meet the burden of proof imposed upon him as required by authorities heretofore cited, and that defendant did not arbitrarily abuse his discretion in refusing to terminate plaintiff's trust. Therefore, that part of the judgment of

the trial court ordering that costs incurred in the county court and the district court and allowing defendant trustee's attorney a fee of $10,000, all to be paid by defendant trustee out of the trust estate, should be and hereby is affirmed. Defendant has also asked for an allowance of attorneys' fees for services rendered in his behalf in this court. In view of the amount of such allowance made in district court, we believe an additional $2,000 for services rendered here would be adequate. Therefore, such sum is allowed and ordered paid by defendant out of the trust estate. On the other hand, that part of such judgment which ordered that defendant trustee should immediately terminate plaintiff's trust and make an accounting to date of its termination, should be and hereby is reversed, and the cause is remanded with directions to render judgment accordingly in favor of defendant. All costs incurred in this court should be and hereby are taxed to plaintiff and ordered paid by defendant out of the trust estate.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.