KARLEN et al., Appellants in No. 11362 and Respondents in No. 11372 v. KARLEN et al., Respondents in No. 11362, and KARLEN et al., Appellants, in No. 11372, and, ARDIS et al., Appellants in No. 11362 and Respondents in No. 11372

(235 N.W.2d 269)

(Files No. 11362, 11372. Opinion filed November 7, 1975)

Vincent J. Protsch and Thomas R. Pardy, Howard, and J. H. Lammers, Madison, for plaintiffs, appellants and respondents, Merrill Karlen, as Administrator of the Estate of Willis W. Karlen, a/k/a W. W. Karlen, Deceased, and Joan M. Hamiel, as. Administrator of the Estate of Arthur J. Karlen, a/k/a A. J. Karlen, Deceased, for said estates and the heirs at law of the two decedents, including themselves.

Lyle P. Sage, Howard, for intervening plaintiffs and respondents, Jeanne Ann Ardis, JoAnn Kuehl, and Arlene Martin as Guardian Ad Litem for Michael McCreath Martin and Patrick Mack Martin:

Laird Rasmussen, Sioux Falls, and Paul R. Green, DeSmet, for defendants and respondents L. W. Karlen, Jr., and Betty J. Karlen.

Eugene C. Mahoney, Sioux Falls, for defendant and respondent Miner County Bank.

Lyle P. Sage, Howard, for defendant and respondent Farmers State Bank of Carthage.

Roy E. Willy, Sioux Falls, for defendant and respondent Security Bank of Madison.

Howell L. Fuller, Sioux Falls, for defendant and respondent Northwestern Nat. Bank of Sioux Falls.

Robert C. Heege, Sioux Falls, for defendant and respondent Mitchell Nat. Bank.

**Richard W. Sabers,** Sioux Falls, for Dr. John E. Karlen and Robert D. Karlen, defendants and appellants and respondents.

WINANS, Justice.

An attempt to dispose of a sizable estate by its owner prior to death and without the services of lawyers or the benefits of the customary probate process has resulted in a most intricate case which has been before our courts well in excess of five years and which has involved numerous counsel and undoubtedly great expense.

Willis W. Karlen and his brother Arthur J. Karlen lived on their farm or ranch near Vilas in Miner County, South Dakota, until their deaths at advanced ages, Arthur dying in January of 1966 and Willis dying in November of 1968. Arthur had been married and divorced early in life and had never remarried. Willis was a lifelong bachelor. While neither had children of his own it appears that they were both visited from time to time by the children and grandchildren of their several brothers and sisters and that they made attempts to keep in touch with them and from time to time offered some of them at least financial assistance. Notable among these Karlen descendants were the three sons of Louis Karlen, a brother of Willis and Arthur who had died in Buffalo, New York, in 1944. These three boys, Louis, John and Robert, had come to live in South Dakota first with another uncle and then with Arthur and Willis at Vilas shortly after their father's passing. After a year or so John and Robert joined their mother in California. Young Louis remained on the ranch. He attended local schools, spent several semesters at Drake University, returned to the ranch for a few years and while there he married. Eventually he returned to college, completed his undergraduate and his medical school education, served an internship and then took up residence and began medical practice at Madison, South Dakota. At the time of the hearing before this court he and his family had removed to DeSmet, South Dakota.

Neither Arthur Karlen nor Willis seems to have had very much use for lawyers, although they had employed their services on occasion, particularly in regard to the disposition of their father's estate. For the most part they liked to attend to their own

business and legal affairs. Apparently they had hoped to pass on all or most of their assets to various family members without probate. While they both lived much of the Karlen property was held by them in joint tenancy. After Arthur's death Willis busied himself changing titles to reflect joint tenancy with fifty or more nieces, nephews, grandnieces and grandnephews. Upon Willis' death several of his relatives, including the administrators of the estates of both Arthur and Willis, commenced an action to strip Dr. Louis W. Karlen, his wife and his children, of everything they had claimed in one way or another from the real and personal property of Willis and/or Arthur. Plaintiffs sought to regain all of the Karlen lands in South Dakota and Iowa, the proceeds of jointly held bonds, the proceeds of certificates of deposit and time savings certificates in several banks, a Chevrolet automobile and some personal effects of Willis Karlen and at the same time they sought to impose upon defendants various penalties and tax liabilities. Plaintiffs also sought to recover from Louis' two brothers, John and Robert, two savings accounts held jointly in an Iowa bank with their uncle Willis. Finally, intervening plaintiffs, who had received no financial gifts from Willis comparable to those he had given other relatives of the same degree, sought from the Willis Karlen estate amounts similar to those their cousins had been given. Charges of undue influence, breach of fiduciary duty, fraud and the like were leveled against Dr. Karlen. After a hearing covering some nine days the trial court found in favor of the defendants on all but two issues. It directed defendants to turn over to the administrator of the Willis Karlen estate the items they had taken from Willis' motel room and it declared the Iowa bank accounts claimed by John Karlen and his brother Robert to be assets of the Willis Karlen estate.

We affirm the trial court on all issues, except that of the Iowa bank accounts for John and Robert. On that subject we reverse the lower court and declare that John and Robert are the rightful recipients of the proceeds of those two accounts.

This case is a maze of complexity, filled with inter-connecting and overlapping issues. For clarity's sake we will deal with the issues one at a time and we commence with the all-pervading question of the nature of the relationship between Dr. Louis

Karlen and his uncle Arthur and Dr. Louis Karlen and his uncle Willis. Manifestly, Louis Karlen, or "Junior" as he was called by his uncles, at all times since he took up residence with his uncles at Vilas after his father's death in 1944 enjoyed a unique position in their home and in their affections. This is clear from the record. His relationship with Willis and Arthur was not only different from the relationship of the two with other nieces and nephews, it was also different from the relationship enjoyed by either of Louis' two brothers with those same uncles. Over the course of two decades or more Louis Karlen was raised by these men who stood during his minority *in loco parentis.* They fed, clothed, housed and educated him and apparently had much affection for him. He, in turn, worked on their ranch and gradually assumed greater and greater responsibility. In due time he assisted his uncles in their business transactions and he enjoyed at least implied authority to sign the name of Willis W. Karlen to checks and documents. Yet, though Dr. Karlen seems to have enjoyed his uncles' fullest confidence it also seems that to their dying day they each maintained an independent judgment in the conduct of their affairs and had the final say on how things were to be done.

■ Plaintiffs have alleged that Louis Karlen abused his relationship of trust and confidence with his uncles and have even hinted that he might have kept them "under control" through medication. They have not, however, either to the satisfaction of this court or the court below, been able to demonstrate that such a breach ever took place. Indeed, there is ample evidence in the record, viewing all of the circumstances, to dispel any inference of fraud, undue influence, or the like which the plaintiffs may have created. We think it not insignificant, *inter alia,* that plaintiffs themselves have not asked the court to set aside the gifts to forty-eight nieces and nephews in several degrees of kinship of some $144,000 in bonds made possible through Dr. Karlen's signing his uncle Willis' name to requests for reissue. These new bonds were kept by Dr. Karlen and distributed only after Willis' funeral. In keeping and faithfully distributing these bonds Dr. Karlen seems to have filled his fiduciary duty to his uncle. We find then, with the trial court, that Dr. Louis W. Karlen enjoyed a confidential and nearly filial relationship with both his uncle Arthur and his uncle Willis. We further agree with the trial court

that plaintiffs have in no substantial way demonstrated a certain violation of this fiduciary relationship and we believe that Dr. Karlen has placed enough in the record to dispel any inference of plaintiffs' case against him in this respect.

██ A major part of this litigation is devoted to the matter of the rightful ownership of properties in South Dakota and in Iowa represented by a number of warranty deeds. It appears that it was the business practice of Willis and Arthur Karlen to keep on hand a number of standard form warranty deeds which were signed and acknowledged before a notary but which were left blank in part for long periods. It is Dr. Louis Karlen's testimony that his uncle Willis, in the presence of his uncle Arthur, delivered these deeds to him at the ranch in Vilas while he was on a visit home there from medical school in November of 1961. He further testified that the deeds at that time had been completed in all respects and that the blanks—or some of the blanks at least—had probably been filled in on the typewriter by his uncle Arthur who frequently used that machine, something his uncle Willis seldom resorted to. Plaintiffs' contention is that Louis Karlen never did receive the deeds but rather that he purloined them and inscribed his own name as grantee. They further allege that even if his testimony as to their delivery and receipt is accepted by the court the deeds are still invalid because Arthur Karlen lacked written authority to complete the already signed instruments. The trial court found that Plaintiffs had failed to prove that Dr. Louis Karlen purloined the deeds. The record substantiates the validity of that finding. The trial court also found that there was a proper delivery of all the deeds in question. In other words, Dr. Louis Karlen received as a gift from his uncle Willis the land in question at about the time stated and that the deeds, when received, were in proper form.

It is unfortunate that these transfers were not recorded until both uncles were dead, but that does not affect the finding. This court has held that "[w]hether there was a delivery is a question of intent to be found from all the facts surrounding the transaction. The rule seems to be well settled that a deed duly executed and acknowledged and shown to be in the possession of the grantee is self-proving, and the burden of proving nondelivery is upon the party claiming that it was not delivered.   *   *   *

The presumption is not overcome by the fact that the deed was not recorded prior to the death of the grantor." *McGillivray v. Wipf*, 1936, 64 S.D. 367, 266 N.W. 724. In this instance Plaintiffs have not proven nondelivery and the presumption in favor of the holder of the deeds, Dr. Louis Karlen, remains.

While we do not rest our decision on conjecture we nevertheless note in passing that the Karlen family seems to have had a pattern of disposing of estates in advance of death as far as possible. It does not seem unlikely that Willis Karlen would have been at least as determined to pass along his real estate in this fashion as he was to dispose of his bonds and certificates of deposit. Had he not been convinced in his own mind that his lands were already taken care of and that his favored nephew was also well provided for he might well have been expected to do exactly as the trial court found he had done. Be that as it may, we cannot say that in any sense the plaintiffs below have proved nondelivery of proper instruments to Louis.

■ We have no reason to deny the authenticity of Willis' signature on the disputed deeds. Accepting the trial court's finding of delivery of the completed deeds by the uncles to Louis, is the prior partially-blank condition of any of these deeds of consequence? We think not. There is no question that until the name of the grantee is filled in by one with written authorization from the grantor (SDCL 43-25-1) a deed otherwise properly executed is a nullity in most circumstances. *Stalting v. Stalting,* 1927, 52 S.D. 318, 217 N.W. 390. However, cases in this line are concerned generally with deeds left in the hand of an agent by the grantor after the grantor has signed them to be completed by the agent or another and turned over to the grantee in the absence of the grantor. This is not the situation in the case at bar. Even if the Karlen deeds had all been signed and acknowledged in blank many years before and the blanks in question had been completed only moments before delivery, whether by Willis, Arthur or even Louis it matters little. As long as the blanks in the deeds remained the deeds were ineffectual. Once the deeds had been completed and were thereupon properly delivered they took effect. Arthur Karlen needed no more written authorization from his brother to fill in the deeds at his brother's direction than would have a confidential secretary or a public

stenographer so long as the transaction took place while the instruments were still within the control of the grantor and before he himself had delivered them. If Arthur Karlen did in fact complete the blanks he was acting not as an agent in the proper sense but merely as a typist. Had he, or anybody else, completed the deeds and not returned them to the grantor for the grantor to make delivery the situation would have been different but we need not deal with that here.

Plaintiffs also attack delivery of the deeds because some mention had casually been made on rare occasions of the possibility of the sale of some vaguely designated portions of Karlen lands. In *Chamberlain v. Larsen,* 1934, 83 Utah 420, 29 P.2d 355, the Utah court said: "[t]hat the grantor, after the execution of the deed, continued to pay the taxes on the property, carried the insurance in her name, and expressed to various persons a desire to sell a part or all of the property is not, when the relationship existing between the grantor and grantee is taken into consideration, inconsistent with an actual delivery of the deed." We think that these same words may be applied here. In 1961 Willis and Arthur were both up in years and it is not at all inconceivable that they felt that the time had come to make Dr. Karlen a gift of the land long promised him while at the same time intending themselves to remain on the ranch for the balance of the time left to them.

In brief, while Plaintiffs may or may not have had reasons to be suspicious of the property transfers because of the conduct of both of the uncles and of the nephew in question the whole course of events is not inconsistent with the business practices of those involved. This court has no reason to find that the lower court erred in finding that the deeds were valid and that they were properly delivered to Dr. Louis W. Karlen and that he is the legitimate grantee.

On several occasions the late Willis Karlen and his nephew Louis went to what is now the Northwestern National Bank branch in Madison, South Dakota, with a number of bonds which Willis ordinarily kept at home. Willis and Louis obtained the forms needed to apply for the reissue of the bonds, sequestered themselves in the bank's conference room, and there

completed the owner's portion of the forms. In each case the request forms list a change on the bonds from the names of "Willis W. Karlen or Arthur J. Karlen" to "Willis W. Karlen or (one of the many nieces and nephews of various degrees of Willis)." It is not disputed that Dr. Karlen physically signed most or all of the reissue requests nor can it be seriously disputed either that Willis Karlen directed him to sign the requests and that Willis Karlen presented the requests to the bank officer for certification, acknowledging that the request and signature in each case were his. In *Gunsul v. Gunsul*, 1924, 47 S.D. 388, 199 N.W. 243, this court accepted the proposition that a grantor, by acknowledging a deed before a notary public, adopts as his signature his name written thereto by his wife, at his request and in his presence. Clearly, Willis W. Karlen adopted the signature on the requests to reissue the bonds as his own. Plaintiffs have cited us to U.S. Treasury Department Circular No. 888, 2nd revision (1964), regulations which require a bondholder to sign a request for payment in the presence of an officer authorized to certify requests for payment. But it is another section of the same regulations which deals with reissue and denominational exchange (subpart J). We deal here not with *payment* but with *reissue* and we have no authority to hold or reason to believe that what is required for payment must necessarily apply to questions concerning reissue. In the case of payment the positions of government and of bondholder are changed considerably and requirements might well be more stringent because of that. In the case of reissue the position of government and bondholder, that of debtor and creditor, is little altered. The government still remains obliged to pay the same amount of money to the legitimate holder of the bond. Even if the payment provisions should apply in this case they must admit of exceptions. To adhere as strictly to them as Plaintiffs would request would be to preclude legitimate bondholders who could neither write nor make a mark from obtaining payment and reissue. This could not be tolerated.

There is a strange inconsistency in the plaintiffs' pleading. On the one hand we are asked to admit that the reissue of all the bonds was void and invalid. On the other hand Plaintiffs seek a constructive trust only on those bonds of which Dr. Louis Karlen and his immediate family are the owners. In effect Plaintiffs ask

us to acknowledge that when Dr. Karlen acted for his uncle on behalf of other relatives he was acting properly, but when he acted in similar fashion for himself and his immediate family his behavior was suspect. This we will not do.

We hold that the action of the trial court in upholding the validity of the reissue of the bonds in question to Willis W. Karlen and the named nieces, nephews, grandnieces and grand-nephews, including Dr. Louis W. Karlen and the members of his immediate family, was not clearly erroneous and must be allowed to stand. Willis Karlen, by all acceptable standards, signed by adoption the requests for reissue when he presented them on each occasion to the bank officer to be certified. There is no cause in the record to support a charge of fraud in this regard. It was certainly Willis' intention to make the changes which were thus effected. He received most of the bonds upon reissue at his post office box in Vilas and he had ample time subsequent to that to correct any errors. This he did not do. If changes were to be made, Willis Karlen had the opportunity to make them. We think that under the circumstances and in the absence of any proof of fraud all other claimants are in no position to attack the reissue of the bonds and the trial court's decision on all the bonds in this case is affirmed.

Next to be considered are two joint bank accounts which appellants John E. Karlen and Robert D. Karlen assert were properly established on their behalf in Iowa and which the trial court found to be assets of the Willis W. Karlen estate. In late September of 1966 Willis and Louis Karlen flew from Sioux Falls to Des Moines. There they went promptly to the Central National Bank and Trust Company where an account had existed for some time in the name of "Arthur J. Karlen or Willis W. Karlen." Willis directed the bank teller to close out that account, then amounting to more than $18,000, and to transfer one half of it to a new account in the name of "Willis W. Karlen or Robert D. Karlen" and the other half to a new account in the name of "Willis W. Karlen or John E. Karlen." The teller made out two deposit slips in those names for the stated amounts, issued two new passbooks, delivered two signature cards to Willis Karlen to be signed and returned, and put on file at least one "Dummy" signature card, a joint tenancy signature card signed by Willis W. Karlen. After the Karlens had left the bank the teller noticed that

she had forgotten to have Willis sign the withdrawal slip and she then proceeded to cut his signature from an old signature card and affix it to the withdrawal slip she had made out. In due course the old account was apparently closed out and its contents were transferred entirely to the two new joint accounts as per the directions of Willis. The trial court found that "there was no withdrawal slip signed by Willis' W. Karlen and  *  *. * there was no joint tenancy contract created" and that consequently the $18,065.71 from the old account was to become part of the assets of the Willis Karlen estate.

In determining the law of both South Dakota and Iowa we are not unmindful of a Michigan case similar to this one. There a mother and daughter were on record as joint tenants of a savings account. The daughter died and the mother went to the bank with a second daughter and attempted to have the account changed to a joint tenancy with the second daughter. The mother failed to sign a new joint savings account card but instead 'the second daughter signed the card of the former account. There was a question as to whether or not this clerical error had failed to create a new account and thus whether or not the joint account had gone to the daughter or had become an asset of the mother's estate on her demise. The Michigan Supreme Court said by way of preface to its decision that "*  *  * if the appellant as the survivor of her mother is otherwise entitled to this bank deposit, her rights ought not to be jeopardized by the somewhat lax methods used by the bank in transacting its business and keeping its records. Strict formalities are not requisite in creating a joint bank account with right of survivorship." *Equitable & Central Trust Co. v. Zdziebko,* 1932, 260 Mich. 366, 244 N.W. 505. We are in full accord with the rationale of the Michigan court.

It appears to us that the trial judge bottomed his conclusion that no new joint accounts were created on the assumption that the previous savings account in the name of "Arthur J. Karlen or Willis W. Karlen" was still in existence because it had not been terminated by a signed withdrawal slip. True, a signed instrument in the form of a withdrawal slip or a check is normally the means of withdrawing bank funds. Nevertheless, such a writing is not a *sine qua non.* The rule is well stated in case law and summarized thus:

"A bank may, however, if it so desires, waive its right to a written order and pay out a fund on deposit or transfer the deposit to the name of another on the oral order of the depositor. It has been held that an oral statement by a deposition that he desires to withdraw his deposit is in law a demand for the amount the bank owes him even though he does not state or even know the exact sum." 10 Am.Jur.2d, Banks, § 496 (1963).

■ Rather recently the Supreme Court of Washington followed this policy in holding valid the transfer of ownership of an existing account into joint ownership on the authority of a verbal directive transmitted by telephone. Estate of McNeal v. McNeal, 1969, 75 Wash.2d 103, 449 P.2d 100. How much greater weight then should we give to an order admittedly made to the teller by the owner of the account physically present in the bank who waited to receive the new passbooks and signature cards. In similar fashion the Kansas Supreme Court held in a case dealing with payment of funds on oral authorization that "[a] verbal direction from the depositor to the bank to honor checks signed by another, or to pay a sum or transfer a credit, will fully justify the bank in so doing, and compliance with such direction relieves the bank from further liability to the depositor." Mathey v. Central National Bank, 1956, 179 Kan. 291, 293 P.2d 1012. In view of the foregoing it is apparent to this court that Willis W. Karlen succeeded in his attempt to close out the old bank account and to open in its place two new joint savings accounts, and we understand both South Dakota and Iowa law to be the same in this regard.

This being so, were the accounts as established by Willis true joint bank accounts with survivorship rights? We think that they were. In 1957 we held that "[i]t is not essential to the creation of a joint bank account with right of survivorship that the beneficiary depositor have knowledge of the account; that he have possession of the passbook; that he sign a signature card; or make withdrawals therefrom. However, these are all important factors and competent evidence bearing on the question of intention." Barbour v. The First Citizens National Bank of Watertown, 1957, 77 S.D. 106, 86 N.W.2d 526. Subsequently we modified the Barbour holding on the question of who must carry

the burden of proof and we said that " 'in the absence of such evidence (evidence showing different intent), which must be clear and satisfactory, the presumption that the depositor intended the usual incidents of jointly held property when he opened a joint account is sufficient to support a finding to that effect.' " *Wagner v. Wagner*, 1968, 83 S.D. 565, 163 N.W.2d 339.

Even more on point than the foregoing is an Iowa case which we take to be in full harmony with South Dakota law and to be controlling in this matter. *In Re Estate of Stamets*, 1967, 260 Iowa 93, 148 N.W.2d 468, involved the establishment of a joint bank account in the name of "Frank or Lena Stamets." Decedent Frank Stamets had opened an account in the joint title but only he had signed the signature card. Lena neither signed the card nor furnished any of the funds. Frank Stamets left the principal intact but withdrew the interest from time to time, presenting the passbook on each occasion. In this case the Iowa Supreme Court held that "decedent's deposit and the signature card constituted a contract between him and the bank which created a joint tenancy in the account with Lena even though she furnished none of the funds deposited. The bank's undertaking was to repay the funds upon the order of either decedent or Lena or to the survivor upon the death of either." That court went on to say that "[w]e see no sound reason for holding Lena's right to this deposit must fail because she did not sign the signature card. Most of the recent authorities that have come to our attention are to the contrary. Although we have never passed directly upon this particular point, we have never held the signature of the donee-beneficiary to the agreement is necessary to the creation of a joint tenancy in a bank account." While this is of great assistance to us in ruling that a joint account with survivorship rights was created by the Central National Bank and Trust Company with and for "Willis W. Karlen or John E. Karlen," wherein a joint tenancy signature card signed by Willis and later by John has been introduced into evidence, we have other questions about the account for Robert. In his case we are informed that his uncle was given a signature card for the new "Willis W. Karlen or Robert D. Karlen" account and that the teller did not always have those cards signed by either party in her presence. The testimony was that Willis later gave the card to Dr. Louis Karlen who gave it in turn to Robert Karlen after the

funeral of Willis. It seems that the card has never been presented to the bank nor introduced at trial and so we must dispose of this account without benefit of or further reference to a signature card. Fortunately, the Iowa Supreme Court had earlier ruled on the question of the establishment of a joint tenancy bank account without a writing in *O'Brien v. Biegger*, 1943, 233 Iowa 1179, 11 N.W.2d 412. In that case the court held that a joint bank account existed even where there was no writing after it had heard the testimony of the bank teller that the depositor had intended to create such an account. There the court said: "We are entitled, and it is our duty, to accept all reasonable inferences deducible from the proven acts of these people on this occasion. It is a trite, but true, saying, that 'actions speak louder than words'. It is our clear judgment, fully supported by the record that deposit account No. 807 was opened and maintained by Mr. and Mrs. Biegger as a joint account payable to either while living, and to the survivor, as his or her absolute property, upon the death of the other. No other reasonable conclusion suggests itself".

We believe that Iowa law and South Dakota law are the same on the issues involving the bank accounts in Iowa. Viewing all of the circumstances surrounding the establishment of these disputed accounts, and accepting the trial court's finding that Willis W. Karlen was of sound mind at the time of the transaction and free of any undue influence from his nephew Louis, we hold that Willis W. Karlen did in fact terminate the original bank account in the name of "Arthur J. Karlen or Willis W. Karlen" at the Central National Bank and Trust Company in Des Moines by his oral order to withdraw the entire contents thereof and that he in turn did successfully create two separate joint accounts at the same institution, one in the name of "Willis W. Karlen or John E. Karlen" and the other in the name of "Willis W. Karlen or Robert D. Karlen." We further hold that as survivors John E. Karlen and Robert D. Karlen are fully entitled to the proceeds of these accounts and that the accounts are not, as the trial court had decreed in error, assets of the Willis W. Karlen estate.

■ Shortly before his death Willis purchased with his own funds a new Chevrolet automobile. At his own request the title

was put in the name of his nephew, Louis W. Karlen. Plaintiffs contend that the auto was never made a gift from uncle to nephew but was instead in the name of Louis Karlen only for convenience. The trial court found, however, that "[f]rom the evidence it appears to the Court that the buyer of the car, Willis W. Karlen, wanted Louis W. Karlen, Jr., to have the automobile and even went to the extent of asking the seller to change the title to show that." The question is certainly open to debate, but we cannot say that the finding of the court below was clearly erroneous. We therefore affirm its decision with respect to this car.

Appellants urge us to find that the lower court erred in not making a factual determination in regard to inheritance and estate tax liability. In view of the manner in which we have reviewed the entire findings of that court we consider this question to be moot. We are certain that taxes will be determined in the usual manner by the proper authorities and that recourse to the courts resulting from any dissatisfaction will still be available after the several taxing departments have done their work.

An additional question on appeal was the trial court's denial of Plaintiffs' claims against the Mitchell National Bank, the Northwestern National Bank, the Iowa Des Moines National Bank and the National Bank of South Dakota (formerly the Security Bank of Madison, South Dakota). All claims were based on the manner in which various certificates of deposit or time savings certificates were transferred from Willis Karlen to Louis Karlen or other joint owners. In view of our earlier holding that Willis was of sound mind and that Louis neither exercised undue influence on his uncle nor breached his fiduciary relationship and in view of our further finding that Louis W. Karlen did in fact have authority to sign his uncle's name and our holdings that a bank may rightfully honor even oral orders to transfer funds and that the depositor is not to be penalized for lax banking practices, we are of the opinion that the trial court in the matter of all these claims ruled correctly and its decision as to the certificates is hereby affirmed.

In concluding we note that four relatives of Willis W. Karlen received nothing from him, unlike a great number of their

cousins of the same relationship to Willis who each apparently were given $3,000 in bonds. While, with the trial court, we regret this apparent omission on the part of an otherwise generous and thoughtful uncle, we are constrained to say that in light of all the facts presented in the record they are without recourse at law or in equity.

Affirmed in part and reversed in part.

All the Justices concur.