IN RE ESTATE OF ARTHUR H. LIENEMANN, DECEASED.
ARTHUR H. LIENEMANN, DECEASED, BY ARTHUR F. LIENEMANN, PERSONAL REPRESENTATIVE, APPELLANT AND CROSS-APPELLEE, V. DONALD H. LIENEMANN, APPELLEE AND CROSS-APPELLANT.

382 N.W.2d 595

Filed March 7, 1986.    No. 84-496.

Jeffrey L. Stoehr of McGrath, North, O'Malley & Kratz, P.C., for appellant.

Richard A. DeWitt and Michael M. Hupp of McGill, Koley, Parsonage & Lanphier, P.C., for appellee.

KRIVOSHA, C.J., BOSLAUGH, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

SHANAHAN, J.

The controversy involved in this case arose from three bank accounts initially in the name of Arthur H. Lienemann. Arthur opened a savings account at The Packers National Bank (PNB) on April 17, 1970; acquired a certificate of deposit from PNB on May 28, 1971; and opened a savings account with Commercial Federal Savings and Loan Association (CFSL) on March 11, 1974. Each of those accounts was funded entirely by Arthur and stood in Arthur's name alone.

In 1975 Arthur showed signs of "deteriorating mental health" and began relying on his sons for assistance in handling his business and personal matters, especially his son Donald, who lived within a block of Arthur, and another son, Arthur F., who took care of his father's farming operations. Donald and his wife had cared for Arthur for over 15 years, preparing meals, keeping house, and maintaining farm buildings on an 80-acre tract of land owned by Arthur. In 1978 the senior Arthur's children began discussing the possibility of "setting up something to take care of [their] father." On May 15, 1978,

Arthur executed a power of attorney in favor of Donald, conferring power "to handle all checks, drafts, notes, claims and accounts receivable; to sign checks, endorse checks and drafts and make bank deposits." After execution of the power of attorney, however, Arthur continued to attend to his financial affairs, such as personal visits to PNB and CFSL and telephone conferences with bank personnel regarding his accounts.

On January 8, 1979, Arthur came to PNB with Donald, spoke with a bank employee, Helene Lesac, regarding a change in his savings account, and requested that Lesac transfer the balance of his savings account, $13,981.27, to a certificate of deposit which, according to Arthur's instruction, was to be put "in my name and in Don's." As instructed by Arthur, Lesac prepared a certificate of deposit and an accompanying agreement which was signed only by Donald. The certificate of deposit was made payable to "A. H. Lienemann or D. H. Lienemann" under the terms "of a joint type of account." The "contract" signed solely by Donald pertaining to the certificate of deposit stated that the certificate belonged to the depositors "as joint tenants with right of survivorship." Donald also signed a withdrawal slip necessary for transfer of funds from Arthur's savings account and placed his own and Arthur's signatures on a signature card prepared by Lesac. Donald never requested that his name be added to the certificate as a joint tenant.

On May 29, 1979, Arthur again contacted Lesac, requesting that PNB transfer funds from his certificate of deposit purchased on May 28, 1971, into a joint certificate of deposit in the names of Arthur and Donald. In response to Arthur's request Lesac prepared documentation necessary to transfer the $1,658.03 of Arthur's solely owned certificate into a new certificate payable to "A. H. Lienemann or D. H. Lienemann." Again, Donald was the sole signatory of the certificate of deposit "contract" which provided: "This is a Joint Account as defined in and governed by the Nebraska Probate Code [and] payable . . . upon the death of any depositor to any survivor(s) with survivorship rights continuing if there are more than one survivor."

On March 13, 1980, Donald, at Arthur's request, appeared at CFSL to withdraw Arthur's savings account and purchase a new $10,000 money market certificate. Joan Willhun, a CFSL employee, in preparing a document to reflect closing of Arthur's savings account, utilized CFSL's computer and prepared a money market certificate in the names of "A. H. Lienemann and/or Don H. Lienemann; As Joint Tenants WROS."

In addition to the three joint accounts created in 1979 and 1980, Arthur also had a savings account at the Springfield Bank, as well as seven certificates of deposit and one passbook account at CFSL. Donald had also participated in the formation of some of those accounts and, at Arthur's request, periodically reviewed the accounts to ensure that Arthur was receiving the highest possible rate of interest payable on such deposits. Although Donald arranged for Arthur's bank statements to be sent to a separate post office box held in Donald's name and actively exercised his power of attorney on Arthur's behalf, Donald consulted with Arthur "at length" regarding Arthur's financial matters, and, notwithstanding his infirmities, Arthur, not Donald, made the ultimate decisions for disposition of bank accounts.

Donald's involvement in Arthur's financial matters caused some tension among Arthur's children, leading to numerous family meetings and discussions about the possibility of a guardianship or conservatorship for Arthur. On December 17, 1980, by order of the county court for Sarpy County, Herbert H. Lienemann was appointed guardian and conservator of Arthur H. Lienemann. In his capacity as a conservator collecting Arthur's assets, Herbert learned about the certificates in the joint names of Arthur and Donald. When Herbert, as conservator, demanded delivery of the certificates in December 1981, Donald refused.

On January 8, 1982, Arthur, by Herbert as guardian and conservator, filed suit against Donald, alleging that Arthur was the "sole contributor and source of all funds" for the certificates issued in the joint names of Arthur and Donald. See Neb. Rev. Stat. § 30-2703(a) (Reissue 1979) (ownership of a joint account during the lifetime of all parties). Arthur also

alleged that Donald's name as a payee on the certificates was inserted without Arthur's authorization during existence of the power of attorney given to Donald and that Arthur was the absolute owner of the certificates. Arthur died on January 13, while his suit was pending against Donald, and Arthur F. Lienemann was appointed personal representative of the estate of Arthur H. Lienemann, deceased. Pursuant to the personal representative's motion, without objection, the plaintiff in the lawsuit against Donald was by substitution designated as "Arthur H. Lienemann, deceased, by Arthur F. Lienemann, Personal Representative." In an amended petition the personal representative renewed the allegation concerning the power of attorney given Donald and, further, alleged that Donald's action regarding the certificates was "a breach of trust of a fiduciary, trusted relationship between Arthur H. Lienemann and Donald H. Lienemann."

At trial the evidence primarily centered on circumstances surrounding issuance of the three joint certificates of deposit. Helene Lesac of PNB had some difficulty recalling whether the request for joint names as payees on the two PNB certificates was made during Arthur's personal visit to the bank or in a telephone conference with Arthur. Also, Lesac was somewhat uncertain about the source of funds for the certificates. Joan Willhun of CFSL testified she prepared the certificate as a joint account. When the Lienemann account number for the previous account was "poked" into CFSL's computer, the terminal's display screen, Willhun testified, showed "A. H. Lienemann, Don Lienemann, the address [and] I believe it said WROS." Consequently, according to Willhun, the same form of account ownership was used in the new certificate as had been indicated for the previous savings account. Another witness, Debra Estes, CFSL's deposit services manager and custodian of CFSL's records, referred to yearly earnings reports generated by the computer, that is, reports showing that throughout the years 1977, 1978, and 1979 the savings account was owned by Arthur either solely in his own name or in reference to the power of attorney given to Donald. Earnings reports pertaining to Arthur's other CFSL accounts also stated that Arthur was the sole owner of those accounts. Based upon

such reports, Estes concluded that if she had been issuing the certificate of March 13, 1980, she "would have issued it as an individual account." Donald also testified and attempted to clarify his participation in the creation of the accounts, acknowledging that he assisted Arthur in obtaining the new certificates and signed documentation relative to the certificates. Donald, however, persisted in asserting that he "did not know anything about the titling" of the accounts.

The district court found "[t]hat it was not the intention of the parties of the account" to place the CFSL account "in the joint names of Arthur H. Lienemann and Donald H. Lienemann" but that "[i]t was the intention of Arthur H. Lienemann" to place the two PNB accounts "in joint ownership with Donald H. Lienemann"; found that Arthur H. Lienemann was the sole owner of the CFSL account; ordered a constructive trust imposed on the CFSL account for the benefit of the estate of Arthur H. Lienemann, deceased; and declared Donald as the owner of the PNB accounts.

The estate contends the district court erred in (1) finding that Arthur intended that his PNB accounts be transformed into joint accounts with the right of survivorship in Donald; (2) disregarding Donald's claimed ignorance and, therefore, lack of intent bearing on the application of Neb. Rev. Stat. § 30-2704 (Reissue 1979); and (3) failing to impose a constructive trust on the proceeds of the PNB accounts on the theory that Donald improperly transformed Arthur's accounts into joint accounts in the names of Arthur and Donald. In his cross-appeal Donald maintains that the court improperly applied the provisions of § 30-2704 in determining the CFSL certificate was not a joint account but was owned by Arthur alone, and, thus, erred in holding that Donald did not acquire the CFSL account by right of survivorship.

Section 30-2704(a) in part provides: "Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intention at the time the account is created."

On appeal to the Supreme Court, an equity action is a trial of factual questions de novo on the record, subject to the rule that,

where credible evidence is in conflict on material issues of fact, the Supreme Court will consider the fact that the trial court observed the witnesses and accepted one version of facts over another. See, Neb. Rev. Stat. § 25-1925 (Reissue 1979); *Kleager v. Schaneman*, 212 Neb. 333, 322 N.W.2d 659 (1982).

Under § 30-2704, at the death of a party to a joint account, funds in such account belong to the surviving party or parties, unless the deceased party's estate can show, by clear and convincing evidence, that the intention at creation of the account was other than the intention that all funds belong to the surviving party or parties to the account. Consequently, Arthur's estate had the burden to show that Arthur had an intention different from that reflected by the words found on the face of the certificates of deposit and in the agreement regarding the accounts and that such different intention was established by "that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved." *Castellano v. Bitkower*, 216 Neb. 806, 812, 346 N.W.2d 249, 253 (1984) (meaning of "clear and convincing" evidence).

Lesac testified that Arthur specifically requested that both PNB accounts be opened and certificates issued in the joint names of Arthur and Donald. Although Lesac faltered somewhat in her testimony concerning the paperwork pertaining to issuance of the new certificates, Lesac's testimony does not negative the statutory consequence of a presumption that a joint bank account belongs to the surviving party pursuant to § 30-2704. Donald's signing all documents regarding the accounts was consistent with the unassailed power of attorney given by Arthur authorizing such action. Donald's conduct pursuant to the power of attorney does not evidence any intent counteracting the statutory presumption and disposition of a joint bank account.

Next, the estate contends that § 30-2704 requires examination of the intent of all parties to a statutory joint account to determine whether "there is clear and convincing evidence of a different intention at the time the account is created." In the present case the evidence shows Donald's lack of knowledge that the certificates were joint accounts, and,

thus, Donald could not have intended that the PNB certificates be joint accounts with right of survivorship.

As a general rule, it is not necessary that a donee or beneficiary have knowledge about creation of a joint account, sign a signature card, or either deposit or withdraw funds from the account in order to establish a valid joint tenancy in a bank account. See, *Estate of Barnhart v. Burkhardt*, 194 Colo. 505, 574 P.2d 500 (1978); *Karlen v. Karlen*, 89 S.D. 523, 235 N.W.2d 269 (1975); *In re Estate of Stamets*, 260 Iowa 93, 148 N.W.2d 468 (1967). Even where a surviving party has not known that another has created a joint account involving the survivor, nevertheless the survivor acquires ownership of the funds in the bank account under normal survivorship principles of joint tenancy. See *Estate of Barnhart, supra*. Section 30-2704, in particular, obviously contemplates a situation where one uses a joint bank account as a means to dispose of personal property upon such individual's death. See, Comment to § 30-2704 (the underlying assumption is that most persons using joint accounts want the survivor or survivors to have the balances remaining at death); Comment to § 30-2703 (the theory of these sections is that "the account operates as a valid disposition at death rather than a present joint tenancy"). In construing Idaho's statutory scheme, similar to the Nebraska Probate Code, the Idaho Court of Appeals stated that "[i]n determining the effect of a joint account agreement, the significant consideration is the intent of the depositor." *Erhardt v. Leonard*, 104 Idaho 197, 201, 657 P.2d 494, 498 (1983). See Idaho Code § 15-6-103 (1979). See, also, *In re Estate of Dembiec*, 321 Pa. Super. 515, 468 A.2d 1107 (1983) (under statute substantially similar to § 30-2704, court focuses solely on the intent of the depositor). See Pa. Cons. Stat. Ann. tit. 20, § 6304 (Purdon Cum. Supp. 1985). We conclude that where an individual creates and funds a bank account, naming that individual and another or others as parties to such account, only the intent of the individual creating and funding the account is relevant under § 30-2704 in determining the nature of the account, that is, whether there is right of survivorship pertaining to an account.

In the present case only Arthur opened or created and

funded the accounts in question. Donald's involvement was only as a conduit to effect the express intent of Arthur, namely, that the accounts should stand in the joint names of Arthur and Donald. Under the circumstances the status on Donald's intent, as the ultimately surviving party, was irrelevant in determining whether the accounts in question were joint accounts with right of survivorship within the purview of § 30-2704. The district court was correct in disregarding Donald's intent, or lack thereof, at the time the joint accounts were created.

Finally, the estate argues a constructive trust should have been imposed for its benefit regarding the PNB accounts on the theory that Donald abused a confidential relationship with Arthur or breached a fiduciary duty resulting from the power of attorney executed in 1978. The estate does not contend that Donald in any manner unduly influenced, coerced, or improperly induced Arthur to create the joint accounts but, rather, argues that Donald violated a fiduciary duty and abused a relationship of confidentiality by being the beneficiary of a banking arrangement effected by exercise of the power of attorney conferred on Donald.

Generally, a court, sitting in equity, will not impose a constructive trust and constitute an individual as a trustee of the legal title for property, unless it be shown, by clear and convincing evidence, that the individual, as a potential constructive trustee, had obtained title to property by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that, under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained. See *Musil v. Beranek*, 160 Neb. 269, 69 N.W.2d 885 (1955). Donald's connection with his father's daily and financial affairs is sufficient to produce a confidential relationship between Donald and Arthur. See *Schaneman v. Schaneman*, 206 Neb. 113, 126, 291 N.W.2d 412, 420 (1980) (a confidential relationship exists if one person has " 'gained the confidence of the other and purports to act or advise with the other's interest in mind' "). The estate, however, has presented no evidentiary basis from which anyone could reasonably find that Donald caused creation of the joint accounts through fraud or

misrepresentation. Also, the circumstances surrounding the accounts and the relationship between Donald and Arthur do not establish an abuse of a confidential relationship for which equity and good conscience preclude Donald's retaining ownership of the accounts in question. Contrary to the proposition advanced by the estate, mere receipt of a benefit by a confidant, as the result of a transaction in which the confidant has participated on behalf of or in concert with the entrusting individual, does not, itself, furnish a basis for imposition of a constructive trust on property acquired by or benefiting the confidant as a consequence of the transaction. See *Ford v. Jordan*, 220 Neb. 492, 499, 370 N.W.2d 714, 719 (1985) ("[s]uch circumstances may certainly raise in reasonable minds a question as to whether" the confidant acted properly, but "they fall short of meeting the quantum of evidence required" to establish the basis for establishing a constructive trust).

The estate further contends that the power of attorney conferred on Donald created a principal-agency relationship between Arthur and Donald, imposing upon Donald the specific fiduciary duties of an agent, including the duty to avoid using his agency status to obtain economic advantage. According to the estate, Donald's actions in using the power of attorney to create the joint accounts constituted a breach of the specific fiduciary duty and justify equitable relief.

A power of attorney is an instrument in writing authorizing another to act as one's agent. The agent holding the power of attorney is termed an "attorney in fact" as distinguished from an attorney at law. See *Matter of Estate of Mehus*, 278 N.W.2d 625 (N.D. 1979). Because the power of attorney creates an agency relationship, the authority and duties of an attorney in fact are governed by the principles of the law of agency, see *Matter of Estate of Mehus, supra*, including the prohibitions against an agent's profiting from the agency relationship to the detriment of his principal or having a personal stake that conflicts with the principal's interest in a transaction in which the agent represents the principal, see *Johnson v. First Nat. Bank*, 253 Ga. 233, 319 S.E.2d 440 (1984).

The problem with the estate's position is that the PNB accounts were created at Arthur's specific direction without any

formative instruction from Donald. While his condition may have been deteriorating toward ultimate appointment of a guardian or conservator, Arthur, nevertheless, actively handled his financial affairs, notwithstanding the power of attorney conferred on Donald. Although Donald's claim that he was ignorant of the nature of the accounts is somewhat suspect in the light of his involvement in creating the accounts, the evidence that the accounts were created at Arthur's specific direction negatives any contention that Donald breached a fiduciary duty owed to Arthur. Cf., *Johnson v. First Nat. Bank, supra* (attorney in fact deposited $5,000 of her father's assets into a joint checking account without the father's consent); *Matter of Estate of Mehus, supra* (evidence established that attorney in fact created joint account by unduly influencing the principal).

We conclude, therefore, that the district court did not err in its judgment that the funds on deposit in the two PNB accounts were the sole property of Donald by right of survivorship according to the terms of the certificates of deposit, joint accounts pursuant to § 30-2704.

With regard to Donald's cross-appeal, there is no question that the CFSL 1980 money market certificate was issued as a joint account and, thus, entitled to the statutory presumption of intent for the right of survivorship in favor of Donald. See § 30-2704(a). Donald contends that the estate failed in its burden to adduce clear and convincing evidence that there was a "different intention" at creation of the account, namely, an intention that funds on deposit would not belong to Donald as the surviving party to the account.

In contrast with the PNB accounts, the CFSL account was established without any instruction or direction from Arthur. Joan Willhun testified that Arthur's savings account was, at March 13, 1980, already designated a joint account, but such fact was contradicted by Debra Estes, custodian of CFSL's records. Although the Estes testimony was not itself conclusive on the point, the testimony of Debra Estes strongly suggests that the CFSL account was never a joint account before March 13, 1980. The district court observed the witnesses and was entitled to accept the version of events recited by the custodian,

Debra Estes. See *Kleager v. Schaneman*, 212 Neb. 333, 322 N.W.2d 659 (1982). Whether the result of computer error or clerical misinterpretation of data from the computer, the fact remains that transformation of the account standing in Arthur's name alone into a joint account was unilaterally erroneous on the part of the depository and done without reference to any intent on the part of the depositor. From all this there is one reassuring revelation: machines, in making mistakes, are becoming human. We find no error in the district court's conclusion that the CFSL account was solely owned by Arthur, because the estate satisfied its burden of establishing by clear and convincing evidence that Arthur did not intend to transform his savings account at CFSL into a joint account for Donald and himself.

The errors assigned by both parties are without merit. The judgment of the district court is correct in all respects and is, therefore, affirmed.

AFFIRMED.