In re Delano Douglas
**SCHNEIDER, Debtor.**

**Delano Douglas SCHNEIDER,**
Appellant,

v.

**Susan J. DAVIS, Appellee.**

**BAP No. OR 88–1016–AsJMo.
Bankruptcy No. 385–03153–P11.
Adv. No. 85–0758.**

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted Sept. 16, 1988.

Decided June 6, 1989.

---

William F. Hoelscher, Portland, Or., for appellant.

Michael G. Hanlon, Portland, Or., for appellee.

## OPINION

Before ASHLAND, JONES and MOOREMAN, Bankruptcy Judges.

ASHLAND, Bankruptcy Judge:

Debtor Schneider appeals the bankruptcy court's judgment determining his debt to the appellee to be nondischargeable pursuant to 11 U.S.C. § 523(a)(4). We affirm.

## FACTS

The facts of this case are not disputed. In the latter part of 1980 the appellee Susan J. Davis became friendly with the debtor Delano Douglas Schneider and his first wife. The debtor was at the time, and presently is, an ordained minister of the United Church of Christ. The relationship between the debtor and Davis developed, beyond a friendship, into a counselor-patient relationship.

Davis began to schedule regular appointments with the debtor for counseling concerning psychological scars from an automobile accident and help in coping with the illness and eventual death of her mother. Davis' therapy included hypnosis, screaming therapy, beating on objects, meditation, and sexual therapy.

Upon the death of her mother Davis turned to the debtor for help and advice in investing her inheritance. At the time, the debtor and his brother were involved in developing a ranch for use in the debtor's ministry, where parishioners could meet for seminars, and so forth. The debtor discussed his plans for the ranch with Davis and she became enthused with the idea.

A site was found for the ranch in Mosier, Oregon, but in order to close the deal the debtor and his brother needed $85,000. They attempted to get a loan and by December 1981 thought that one had been approved. They, along with Davis, went from Hawaii to Oregon to close the deal. Once they arrived in Oregon they found

that the loan had not been approved; thus, they still needed $85,000. Prior to leaving for Oregon, the debtor requested that Davis bring certificates of deposit and other indicia of ownership of her inheritance. Davis used the certificates as collateral on what was meant to be a short-term loan until the bank loan was available. She pledged $82,270 as security for the promissory notes.

When Davis and the debtor returned to Hawaii, the two became lovers. When the first promissory note for $45,000 became due the debtor went to the bank with Davis and assisted her in withdrawing $45,000 from her account to pay off the note.

At about this time the debtor suggested that Davis go to Oregon and live on the ranch. Before she left, however, she gave a check for $14,000 to the debtor at his request. The check was made out to Schneider Acres, Inc., a corporation owned by the debtor and his brother. A few days later she made out another check, to the sellers of the Oregon property, for $10,000. She was further instructed by the debtor to take out loans on her life insurance policies. When the loans on the life insurance policies arrived Davis was already in Oregon. The checks were sent to her to endorse, and the debtor then deposited them into a joint account with Davis. On the day before Davis went to Oregon the debtor took Davis to his attorney and had a general power of attorney drafted.

Once living in Oregon, Davis made a loan to the debtor's brother for $2,000. She further spent $6,946 in maintenance and improvements on the ranch. It came to Davis' attention that the debtor's brother knew about the life insurance loans and that he told the sellers of the property that these proceeds would be used to secure the second note. Davis became upset and wrote a letter to the debtor reiterating her understanding that the debtor agreed to ·protect her retirement "security blanket" by advising her regarding the investment of her money.

The ranch did not produce any income and was ultimately unsuccessful. Davis brought an action and obtained a judgment against the debtor, his brother, and Schneider Acres, Inc. for $77,946 plus costs, attorney's fees, and interest. Approximately three months later the debtor filed a Chapter 7 petition. Davis filed a timely complaint to determine dischargeability of her debt. Davis contends that the debt is nondischargeable under both § 523(a)(2)(A), because it was incurred through false pretenses or actual fraud, and § 523(a)(4), because it was incurred as a result of defalcation while acting in a fiduciary capacity.

On May 13 and 14, 1987 a trial ensued and the court issued oral findings of fact and conclusions of law on August 26, 1987. The court found that Davis had not proven her case under § 523(a)(2)(A). Davis did not appeal this decision. However, the court found that the debt to Davis was nondischargeable pursuant to § 523(a)(4) to the extent of $69,000, which was incurred while the debtor was acting in a fiduciary capacity for Davis. The debtor timely appealed.

## ISSUE

Whether the bankruptcy court erred in finding Davis' debt nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

## DISCUSSION

Whether the debtor was acting in a fiduciary capacity under Bankruptcy Code § 523(a)(4) is a question of federal law reviewed *de novo*. *Ragsdale v. Haller*, 780 F.2d 794, 795 (9th Cir.1986).

Section 523(a)(4) of the Bankruptcy Code states that a debtor is not discharged from any debt for fraud or defalcation while acting in a fiduciary capacity. The term "fiduciary" is given a very narrow definition under this section. The broad general definition of fiduciary—a relationship involving confidence, trust, and good faith—does not apply in the dischargeability context. *In re Short*, 818 F.2d 693, 695 (9th Cir.1987); *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir.1986). The trust giving rise to the fiduciary relationship must be imposed prior to any

wrongdoing, which means that the debtor must have been a "trustee" before the wrong. *Haller,* 780 F.2d at 796, citing *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934).

■■■■ These requirements eliminate constructive, resulting or implied trusts. *Short,* 818 F.2d at 695, *citing In re Pedrazzini,* 644 F.2d 756, 759 (9th Cir.1981). The Ninth Circuit has set out the general characteristics of an express trust; they are 1) sufficient words to create a trust; 2) a definite subject; and 3) a certain and ascertained object or res. *In re Thornton,* 544 F.2d 1005, 1007 (9th Cir.1976). The intent to create a trust relationship rather than a contractual relationship is the key element in determining the existence of an express trust. *Id.*

This accords with Oregon law which is to be consulted in determining whether a trust exists. *See In re Short,* 818 F.2d 693, 695 (9th Cir.1987). The Oregon Supreme Court has stated that express words of trust are not necessary to create a trust, so long as the intent is manifest. *Allen v. Hendrick,* 104 Or. 202, 227, 206 P. 733 (1922). An intent to create a trust may be implied from the parties' relationship and acts affecting title to and possession of trust property, though no words referring to trust or trustee were spoken or reduced to writing. *See Winters v. Winters,* 165 Or. 659, 109 P.2d 857 (1949).

In addition to the intent to create a trust relationship, it is essential in creating a trust that the settlor presently and unequivocally make a disposition of the trust property to a trustee, thereby divesting himself of full legal ownership and giving legal title to the trustee. *Windle v. Flinn,* 196 Or. 654, 251 P.2d 136 (1953); *United Pacific Ins. Co. v. First National Bank of Oregon,* 206 F.Supp. 94 (1962). If separation of the legal and equitable interests in the property does not occur, an express trust is not created. *See Morse v. Paulson,* 182 Or. 111, 186 P.2d 394 (1947).

■■■ In this case, the bankruptcy court found that the debtor breached his duty as a trustee of an express trust. The bankruptcy court held that an express trust relationship arose when Davis asked the debtor to help her invest the money and when the debtor agreed to advise her. The court further found that Davis unequivocally made a disposition of the trust property to the debtor. The court stated that while the debtor did not have physical control over the funds at all times, he had actual control over them because Davis had granted him the power.

We agree with the bankruptcy court. A trust relationship arose when the debtor agreed to advise Davis what to do with her money in response to her request for help investing her money. At that time, the debtor was Davis' minister, counselor, therapist, and lover. Davis intended the debtor to be her financial adviser and a trustee of her money. Davis clearly relied on the debtor's promise to invest the money for her, and she transferred her money to the debtor. The trust res was Davis' inheritance and the trust object was to protect her funds for retirement purposes.

As the bankruptcy court found, although the debtor did not have physical control over the money, Davis effectively transferred the funds by paying the first promissory note in the amount of $45,000 and sending a check to the sellers of the Oregon property in the amount of $10,000. There is little difference in Davis' writing out the checks to the debtor personally, and her writing the checks to the owners of the property at the direct instruction of the debtor, while the debtor accompanied Davis to the bank, and where the checks were given to the debtor.

Given these circumstances, we hold that Davis did make an unequivocal disposition of the trust property to the debtor. The $14,000 check which Davis made out to Schneider Acres, Inc. also became trust property for which the debtor owed a duty to invest as a trustee. By allowing the $69,000 to be used for his own purposes, the debtor breached his duty as a trustee. Therefore, the debtor's debt in the amount of $69,000 is nondischargeable under § 523(a)(4).

The bankruptcy court's judgment is affirmed.