**In the Matter of Curtis BURGESS and Roberta Burgess, Debtors.**

**Ray RECH, Guardian and Conservator of Estella Burgess, Plaintiff,**

**v.**

**Curtis BURGESS and Roberta Burgess, Defendants.**

**Bankruptcy No. BK87–1718. Adv. No. A87–0375.**

United States Bankruptcy Court, D. Nebraska.

July 27, 1989.

---

Trev E. Peterson, Atty.

Vincent M. Powers, Atty.

## MEMORANDUM OPINION

JOHN C. MINAHAN, Jr.,
Bankruptcy Judge.

In this adversary proceeding the Conservator for Estella Burgess, the mother of the co-debtor, Curtis Burgess, seeks to establish that the debtors are not discharged from obligations to Estella Burgess. The Conservator asserts that between 1983 and 1986 Curtis Burgess and Roberta Burgess caused certain property of Estella Burgess to be transferred from her estate to and for the benefit of Curtis Burgess and Roberta Burgess personally. During this time period Curtis Burgess held the general power of attorney of Estella Burgess. The Conservator asserts that the obligations of debtors arose from "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny" and are not dischargeable under 11 U.S.C. § 523(a)(4). The Conservator also argues that the injuries to the estate of Estella Burgess were caused by the willful and malicious conduct of the debtors and are not dischargeable under 11 U.S.C. § 523(a)(6).

## FACTS

On November 23, 1983, Estella M. Burgess signed a durable power of attorney appointing Curtis E. Burgess her true and lawful attorney. The power of attorney is general and the enumerated powers are extensive. Bernard Burgess, husband of Estella and father of debtor Curtis Burgess, died approximately one week before execution of the power of attorney. Estella requested her son Curtis to accept the power of attorney. She executed the power of attorney because she did not want to be responsible for the business management of her affairs. At the time of signing the power of attorney, Estella Burgess was represented by counsel. There is no evidence whatsoever that Estella Burgess was incompetent or of diminished capacity at the time she signed the power of attorney.

Prior to the death of Bernard Burgess and prior to the execution of the power of attorney, the debtors, Curtis Burgess and Roberta Burgess, were indebted to the Columbus Production Credit Association ("PCA") on several promissory notes. The notes in evidence which are dated prior to November 23, 1983, have an aggregate principal face amount of $270,000. Curtis Burgess testified that as of October, 1983 a total of $220,000 was owed to the PCA. Bernard Burgess and Estella Burgess are co-makers, with debtors, on each the PCA promissory notes. As between debtors and Bernard Burgess and Estella Burgess, the debtors were primarily liable on the notes. Bernard and Estella are accommodation parties.

After November 23, 1983, Curtis Burgess exercised the power of attorney. He opened a bank account with Farmers State Bank of Rising City in the name "Estella Burgess Special Account". He deposited funds into this account that were received by Estella or by him for her account. Between November 23, 1983, the date of the power of attorney, and January 24, 1986, the date on which a conservator was appointed for Estella Burgess, a number of transactions took place by which the assets of Estella Burgess were transferred to or for the benefit of Curtis Burgess and Roberta Burgess. Some of these transactions were under purported authority of the power of attorney, and others were not. During this period of time Curtis Burgess also maintained a bank account at the PCA for the farming operations of "Burgess Farms" (the "Burgess Farms Account").

Between November 23, 1983 and January 24, 1986, the following transactions occurred and are alleged to have given rise to nondischargeable obligations to Estella Burgess:

1. Curtis Burgess deposited a $2,283 check and a $530 check, each payable to Estella Burgess for income tax refunds, into the Burgess Farm Account.

2. Curtis Burgess conducted an auction at which certain personal property of Estella Burgess was sold. Proceeds of the auc-

tion in the amount of $11,775 were deposited by Curtis Burgess into the Burgess Farms Account. Curtis Burgess bid $1,220 on certain property which was purportedly sold to him at the auction. He did not pay the $1,220. However, I conclude that he was not legally obligated to pay the $1,220 since the personal property involved had been previously given by Estella Burgess to the daughters of Curtis and Roberta Burgess. The property subject to the $1,220 sale was mistakenly auctioned and Curtis bid on the property to assure that the previous gift not be frustrated by the mistaken sale.

3. Roberta Burgess drew 6 checks on the Estella Burgess Special Account. On each of these checks Roberta Burgess was the drawer, Burgess Farms was the payee, and the "memo" blank on the check form had been completed by Roberta Burgess by writing "loan transfer". The aggregate amount of the 6 checks was $31,575 and the checks were all deposited into the Burgess Farms Account. Roberta Burgess allegedly acted upon advice of counsel when she drew these checks. Curtis Burgess testified that he had not authorized her to draw these checks. At the time of the transaction, Curtis had knowledge that these checks were drawn upon the Special Account of Estella Burgess and that the checks were deposited into the Burgess Farms Account. Curtis Burgess was the endorser on some of these checks. The phrase "loan transfer" on the memo line was intended to mean that the funds were transferred from the Special Account of Estella to the Burgess Farms Account.

4. Curtis Burgess cashed three certificates of deposit owned by Estella Burgess and he deposited the proceeds in the Burgess Farms Account. The aggregate amount of the proceeds of the certificates was $62,505. Curtis Burgess endorsed these certificates of deposit under purported authority of the power of attorney.

5. Curtis Burgess drew a check in the amount of $10,000 on the Estella Burgess Special Account payable to himself. He completed the "memo" blank on the check form by inserting the words "1984 Gift".

He signed the check "Estella M. Burgess" and thereunder signed his name "Curtis E. Burgess". In this transaction Curtis intended to act under the authority of the power of attorney. He purported to make a gift from Estella Burgess to himself under authority of the power of attorney. Proceeds of this check were deposited in the Burgess Farms Account.

6. Curtis Burgess drew a check in the amount of $10,000 on the Estella Burgess Special Account payable to Roberta Burgess. He completed the "memo" blank on the check form by inserting the words "1984 Gift". He signed the check "Estella M. Burgess" and thereunder signed his name "Curtis E. Burgess". In this transaction Curtis intended to act under the authority of the power of attorney. He purported to make a gift from Estella Burgess to his wife Roberta under authority of the power of attorney. Proceeds of this check were deposited in the Burgess Farms Account.

7. Curtis and Roberta Burgess had purchased certain real and personal property from Bernard and Estella Burgess under a Real Estate Contract which provided that Curtis and Roberta were to pay the purchase price by making annual payments of principal and interest. Curtis and Roberta Burgess did not make payments when due in 1983 and 1984. Curtis Burgess caused Estella Burgess to make a gift in the amount of $10,000 for 1983 and in the amount of $16,975 for 1984, respecting the Real Estate Contract. These gifts were evidenced by annotations made by Curtis on the "Schedule of Credits by Gifts" attached to the Real Estate Contract. Curtis testified that gifts were intended and that he was acting under authority of the power of attorney. In these transactions, I conclude Curtis Burgess purported to make gifts from Estella to himself and his wife, Roberta, and that the gifts were made by crediting the amount of the gifts against payments due under the Real Estate Contract.

Evidence was presented of a gift from the estate of Bernard Burgess to Curtis and Roberta Burgess. There is also evi-

dence that proceeds of some property of Bernard Burgess was deposited into the account of Burgess Farms. Curtis Burgess, acting as personal representative of Bernard Burgess, made a gift from the estate of Bernard Burgess to himself in the amount of $8,487. Further, the proceeds of certain grain or beans of Bernard Burgess were deposited into the account of Burgess Farms. However, this evidence is not relevant to the amount of any claim asserted by the Conservator. The claims of the estate of Bernard Burgess, if any, against the debtors are not before this court in this adversary proceeding.

The evidence is confusing and unclear about "Burgess Farms." Curtis Burgess testified that Burgess Farms was a farming entity in which he, Roberta, Estella and Bernard Burgess participated. Curtis testified that there was no formal partnership agreement and that Burgess Farms was a "hand shake deal." He stated that Burgess Farms did not start to operate until about 1985 and that it continued in operation until foreclosure proceedings started. Curtis Burgess stated that the PCA developed the idea of "Burgess Farms" to alleviate the necessity for the PCA to obtain the signature of Bernard, Estella, Curtis and Roberta on loan documents. This testimony is inconsistent with other evidence.

Burgess Farms could hardly have been a hand shake deal between deceased Bernard Burgess and the other parties. The unequivocal testimony of Curtis was that the Burgess Farms enterprise was not formed until 1985. This was after the death of Bernard and after the execution of the power of attorney by Estella. If there was some sort of joint enterprise, it was formed among parties all of whom, except Roberta Burgess, were represented by Curtis Burgess. Curtis Burgess acted as the personal representative of his fathers estate, he held a power of attorney of his mother and he represented himself. Moreover, there was no agreement for sharing of profits or losses. The information concerning Burgess Farms is within the knowledge of Curtis Burgess and he has not provided sufficient evidence for me to conclude that "Burgess Farms" was a joint venture or partnership

entity. I conclude that Burgess Farms was simply a trade name for the farming operation of Curtis and Roberta Burgess.

The "Burgess Farms" name or trade style started being used in 1985. Curtis and Roberta Burgess operated Burgess Farms and made all decisions in connection with the management and operation of Burgess Farms. Curtis Burgess arranged for loans from the PCA to enable Burgess Farms to keep operating. Loan documentation with the PCA was signed by Curtis and his wife, and Curtis signed various documents on behalf of Bernard and Estella in his capacity as personal representative of Bernard Burgess and under authority of the power of attorney of Estella Burgess. These documents evidenced the obligation of Bernard and Estella to the PCA and their granting of security interests and mortgages to the PCA.

From time to time after the execution of the power of attorney, the PCA advanced additional funds to Burgess Farms. Curtis and Roberta determined when payments would be made to the PCA. Burgess Farms maintained one bank account and it was at the PCA. Funds in the Burgess Farms Account were used for operating expenses of Burgess Farms, for the living expenses of Curtis and Roberta, and to the extent of $1,000 per month for about two years, for expenses of Estella. Funds in this account were also used for making payments to the PCA on obligations on which Curtis, Roberta, Bernard and Estella were obligated. Curtis and Roberta had exclusive control over the Burgess Farms Account. They determined how funds in that account would be used. Curtis and Roberta Burgess had no farming operation other than the Burgess Farms operation.

When asked about the transactions enumerated above, Curtis Burgess testified that it was the desire of his father and mother that he use their assets for his farming operation. Curtis explained that his father and mother wanted to help him because he had helped them accumulate assets. Curtis testified that the purpose of depositing funds in the Burgess Farms Account was to reduce the overall debt of

Burgess Farms. He stated that he was trying to prevent his father and mother from suffering a loss.

It was argued that the deposit of Estella's funds into the Burgess Farms Account was actually of benefit to Estella since the PCA was ultimately paid in full, except for $2,000. However, this argument is not supported by particular evidence. I have no evidence from which to conclude that particular funds deposited in the Burgess Farms Account were used to make payments to the PCA on obligations upon which Estella was responsible. Nor does the evidence presented permit a determination of whether the financial condition of Estella Burgess is better off today than it would have been had the transactions complained of not taken place. .

## CONCLUSIONS OF LAW

The first issue to be determined is whether Curtis Burgess was authorized under the durable power of attorney to enter into the transactions by which the assets of Estella Burgess were applied for the benefit of Burgess Farms. With the exception of the transactions involving the forgiveness of payments due on the land contract (transaction 7, above,) I conclude that the power of attorney did not authorize Curtis Burgess to enter into the transactions by which the assets of Estella Burgess were transferred to the Burgess Farms Account (transactions 1–6 above).

Under Nebraska Law, a power of attorney creates an agency relationship. *See In re Estate of Lienemann*, 222 Neb. 169, 382 N.W.2d 595 (1986). The power of attorney in this case does not expressly authorize Curtis Burgess to make gifts of the assets of Estella, or to deposit funds of Estella into the Burgess Farms Account. Although the power of attorney is a general and not a limited or special power of attorney, I conclude that it should not be construed to permit the assets of the principal, Estella Burgess, to be used without restriction for the benefit of Curtis Burgess and Burgess Farms. In the words of the Nebraska Supreme Court:

"[b]ecause the power of attorney creates an agency relationship, the authority and duties of an attorney in fact are governed by the principles of the law of agency ... including the prohibitions against an agent's profiting from the agency relationship to the detriment of his principal or having a personal stake that conflicts with the principal's interest in a transaction in which the agent represents the principal."

*Lienemann*, 222 Neb. at 178, 382 N.W.2d at 602. In a case involving a trust relationship, the Nebraska Supreme Court has set forth six factors to consider in determining whether a trustee has abused his discretion. *Scully v. Scully*, 162 Neb. 368, 76 N.W.2d 239 (1956). These six factors are: (1) the extent of the discretion intended to be conferred upon the trustee by the terms of the trust; (2) the purposes of the trust; (3) the nature of the power; (4) the existence or non-existence, the definiteness or indefiniteness, of an external standard by which the reasonableness of the trustee's conduct can be judged; (5) the motives of the trustee in exercising or refraining from exercising the power; and (6) the existence or non-existence of an interest in the trustee conflicting with that of the beneficiary. *Id.* at 376, 76 N.W.2d at 245. Although the instant case does not involve an express trust relationship, I conclude that these factors are relevant in determining whether the debtor, Curtis Burgess acted beyond the scope of the power of attorney. In particular, items 5 and 6 are relevant to the facts of this case.

Curtis Burgess had a conflict of financial and economic interest with Estella Burgess. She was an accommodation party on promissory notes held by the PCA. There was a suretyship relationship between the parties. Estella Burgess was a surety with the attendant common rights to reimbursement, exoneration and subrogation. Curtis and Roberta Burgess were the principal debtors with the obligation to exonerate and reimburse Estella respecting the underlying obligation to the PCA. Upon payment of the PCA debt, Estella would have been subrogated to the PCA claim against Curtis and Roberta. These conflicts of in-

terest were present at the time that the power of attorney was executed by Estella Burgess and she was represented by counsel at that time. She was presumably aware of the potential conflict of interest. It has not been suggested that Curtis was disqualified from assuming the agency.

However, the existence of the conflict of interest and Estella's knowledge thereof do not mean that Curtis Burgess was *authorized* to act in his own best interest. Curtis had a fiduciary duty under Nebraska law and he was required to act in the best interest of Estella Burgess.

The power of attorney was for the benefit of Estella Burgess. If the powers of attorney were liberally construed to permit the agent to make gifts and to commingle funds, the basic purpose of the agency could be frustrated. To construe the power of attorney to permit the agent to make gifts to and for the benefit of the agent would be absurd, unless the very purpose of the agency required such gifts to be made. It would also be contrary to the basic principle of agency that prohibits an agent from having a personal stake that conflicts with the principal's interest.

Under the power of attorney, Curtis Burgess was authorized to make payments to the creditors of Estella Burgess. The PCA was a creditor of Estella Burgess and it would have been appropriate and within the authority of the power of attorney for Curtis to disburse funds directly from the Estella Burgess Special Account to the PCA in payment of the obligation of Estella Burgess on the promissory notes held by the PCA. Had such direct payment been made, it would have given rise to a claim for Estella Burgess to be reimbursed by Curtis and Roberta Burgess. The actual transactions, described in items 1–6 above, however, were different. They involved Curtis Burgess taking funds of Estella Burgess and depositing them directly into the operating account of Burgess Farms. I conclude that the transactions described in items 1–6 inclusive above were not authorized by the power of attorney.

Transaction 7, which involved Curtis Burgess causing Estella Burgess to forgive payments due from Curtis and Roberta Burgess under the terms of a land contract owned by Estella Burgess, is different in character from the other transactions. I conclude that the forgiveness of debt was within the scope of the power of attorney. The land contract relationship did not involve a third party. It evidenced an obligation among family members for certain payments to be made each year. There is written evidence that in some prior years, payments had not been made and that Curtis and Roberta Burgess were credited with a payment by gift. In weighing these factors, I conclude that such a forgiveness of debt was almost ordinary in course among the parties prior to the execution of the power of attorney. I thus conclude that the transaction was within the scope of the power of attorney and that Curtis and Roberta Burgess have no liability with respect to debt forgiven on the land contract.

The next question to be addressed is whether and to what extent Curtis and Roberta Burgess will not receive a discharge from their obligations, if any, to Estella Burgess. Exceptions to discharge are narrowly construed and the burden of proving that a debt is not dischargeable under § 523 is upon the party opposing discharge. *Driggs v. Black (In re Black),* 787 F.2d 503, 505 (10th Cir.1986).

*Exception for Willful and Malicious Injury*

■  Section 523(a)(6) provides that a discharge under § 727 does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The elements of willful and malicious are separate and distinct. Under the test enunciated by the Eighth Circuit Court of Appeals, a debt is nondischargeable under this section if the conduct of the debtor was "headstrong and knowing ('willful') and targeted at the creditor ('malicious')". *In re Long,* 774 F.2d 875, 881 (8th Cir. 1985). Malice involves conduct

"more culpable than that which is in reckless disregard of a creditor's economic interests and expectations, as dis-

tinguished from mere legal rights. Moreover knowledge that legal rights are being violated is not sufficient to establish malice absent additional aggravated circumstances under *Davis (Davis v. Aetna Acceptance Co.,* 293 U.S. 328 [55 S.Ct. 151, 79 L.Ed. 393] (1934)) and its progeny."

*In re Long,* 774 F.2d at 881.

After considering the facts and circumstances of this case, I conclude, as a finding of ultimate fact, that the injuries caused by the intentional and voluntary acts of Curtis and Roberta Burgess to the economic and financial interest of Estella Burgess were willful but not malicious. Accordingly, discharge is not barred under 11 U.S.C. § 523(a)(6).

*Exception for Fraud or Defalcation*

Section 523(a)(4) provides that a discharge under § 727 does not discharge an individual debtor from any debt "for fraud or defalcation while acting in a fiduciary capacity ..." I conclude that Curtis Burgess committed defalcation while acting in a fiduciary capacity.

Whether debtors, Curtis and Roberta Burgess acted in a fiduciary capacity is a federal question. *Ragsdale v. Haller,* 780 F.2d 794, 795 (9th Cir.1986). Under federal law it has been long established that to act in a "fiduciary capacity" the debtor must act in a technical trust relationship rather than those implied from contract. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153–54, 79 L.Ed. 393 (1934). In a case involving Bankruptcy Act § 17a(4), the predecessor of Bankruptcy Code § 523(a)(4), the Eighth Circuit Court of Appeals stated:

The statute has been interpreted to require technical trust relationships rather than those implied from contract.... Additionally, the trust relationship must exist before the incident creating the contested debt and apart from it. It is not enough that the trust relationship spring from the act from which the debt arose.

*Matter of Dloogoff,* 600 F.2d 166, 168 (1979).

In reviewing the wealth of decisional law under § 523(a)(4) and its predecessor,

§ 17a(4) of the Bankruptcy Act, it is apparent that:

[t]he broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context, thus excluding ordinary commercial relationships from the reach of § 523(a)(4).... The debt alleged to be nondischargeable must arise from a breach of the trust obligations imposed by law, separate and distinct from any breach of contract; thus, the trustee's duties must be independent of the contractual relationship.... Finally, the trust must be imposed prior to any act of wrongdoing; the debtor must have been a "trustee" before the wrong and without reference to it. These requirements eliminate constructive, resulting or implied trusts.

*In re Schultz,* 46 B.R. 880, 884 (1985).

There is an interesting interplay between state and federal law under § 523(a)(4). The statute is, of course, federal law. The terms "fiduciary capacity" as used in § 523 are to be defined as a matter of federal law. Since there is no statutory definition of the terms, the meaning of "fiduciary capacity" is a federal question to be determined as a matter of federal common law. The fact that the debtor acted in a fiduciary capacity under state law is not controlling, since, as a matter federal law, a higher degree of fiduciary duty or capacity may be required under § 523 than is present under state law on the facts of the case.

However, if a debtor acts as a trustee under an express trust, as opposed to an implied or constructive trust, the requisite fiduciary capacity under § 523 is present. *Matter of Dloogoff,* 600 F.2d at 168. In determining whether a debtor acted under an express trust, the appropriate source of law is state law. On the facts of this case, I conclude that Curtis Burgess was not acting under an express trust under Nebraska law. At most, the Nebraska Supreme Court would have imposed a constructive trust. *See Lienemann,* 222 Neb. at 178, 382 N.W.2d at 602 (citing *Johnson v. First Nat'l. Bank,* 253 Ga. 233, 319 S.E.2d 440 (1984) with approval).

This does not end the inquiry, however, because the requisite fiduciary capacity under § 523(a)(4) may exist in an agency relationship as a matter of federal common law. Section 523(a)(4) does not expressly mention trusts. Discharge is lost for fraud or defalcation "while acting in a fiduciary capacity ..." The labels of "agency" or "trust" are not dispositive of the question of whether a person acts in a "fiduciary capacity." Form should not prevail over substance. An agent may occupy a fiduciary relationship toward his principal under certain circumstances. *See 3 Collier on Bankruptcy,* ¶ 523.14 (15th ed. 1979). If an agent acts with sufficient fiduciary capacity, discharge may be denied under § 523(a)(6). *See, e.g., Schneider v. Davis (In re Schneider),* 99 B.R. 974 (9th Cir. B.A.P.1989); *Hamby v. St. Paul Mercury Indemnity Co.,* 217 F.2d 78 (4th Cir.1954) (Bankruptcy Act case under § 17a(4)); *In re Weiner,* 95 B.R. 204 (Bkrtcy. D.Kan. 1989); *Estate of Hensel v. Barker (In re Barker),* 40 B.R. 356 (Bkrtcy.D.Minn.1984).

An obligation that arises from the fraud or defalcation of a debtor acting as a trustee of an express trust under state law is barred from discharge. However, if the debtor acted as an "agent" and not as a "trustee," the court must determine, as a matter of federal common law, whether the fiduciary capacity in which the debtor acted was sufficient to meet the § 523(a)(4) standard. The scope and nature of the debtors fiduciary duties should be determined under state law.

■ In this case, Curtis Burgess acted under a power of attorney. Under Nebraska law, he was an agent of Estella Burgess and he acted in a fiduciary capacity. *Lienemann,* 222 Neb. at 178, 382 N.W.2d at 602; Restatement (Second) of the Law of Agency § 13. This general fiduciary capacity does not necessarily rise to the level of fiduciary duty required under § 523(a)(4). *Matter of Angelle,* 610 F.2d 1335, 1338 (5th Cir.1980). Although courts often conclude that an agent does not act in the fiduciary capacity required by § 523(a)(4) and, accordingly, cannot be deprived of a discharge for fraud or defalca-

tion for acts within the scope of the agency, there are decisions to the contrary which find that an agent has acted with the requisite capacity. *See Schneider v. Davis (In re Schneider),* 99 B.R. 974 (9th Cir. B.A.P.1989); *Hamby,* 217 F.2d at 80; *In re Weiner,* 95 B.R. at 204; *Barker,* 40 B.R. at 359.

The scope and nature of the agency relationship between Curtis Burgess and Estella Burgess, and the facts and circumstances of the relationship, lead me to conclude that Curtis Burgess acted in a fiduciary capacity within the scope of § 523(a)(4). Specifically, the following characteristics of the agency relationship fulfill the fiduciary capacity requirement under § 523(a)(4):

1. The power of attorney was a general power of attorney giving the agent control over all the assets of the principal;

2. The power of attorney was durable—it survived the death of the principal;

3. The power of attorney was to be exercised for the sole benefit of the principal;

4. The principal executed the power of attorney intending to give up management of her business affairs in perpetuity;

5. The principal did not in fact subsequently play an active role in the management of her affairs;

6. At the time the power of attorney was executed there existed an economic and financial conflict of interest between the principal and the agent; and

7. The principal, Estella Burgess, signed the power of attorney within one week of the death of her husband. Within approximately two years of the execution of the power of attorney, and during the time the power of attorney was in force and effect, a conservator was appointed for Estella Burgess.

Although the facts of this case do not create a technical express trust relationship under Nebraska Law, I conclude that Curtis Burgess had the fiduciary capacity required under § 523(a)(4). To hold to the contrary would exalt form over substance. If the power of attorney had transferred legal title of the assets of Estella Burgess

to Curtis Burgess, an express trust would be found and the requisite fiduciary capacity would clearly exist. The locus of title should be no more controlling in this case than it is in commercial transactions under the Uniform Commercial Code. *See* U.C.C. § 2–401, official comment 1. In substance, Curtis Burgess was given complete control over the assets of Estella Burgess, he was given broad authority to manage her assets, and he was to do so solely for her benefit. I thus conclude that Curtis Burgess acted in a "fiduciary capacity" within the meaning of § 523(a)(4). *See Schneider v. Davis (In re Schneider)*, 99 B.R. 974 (9th Cir. B.A.P.1989); *Hamby*, 217 F.2d at 80; *In re Weiner*, 95 B.R. at 204; *Barker*, 40 B.R. at 359.

I further conclude that Curtis Burgess committed defalcation while acting in a fiduciary capacity. "Defalcation" for dischargeability purposes is defined as the slightest misconduct, negligence or ignorance and it does not require intentional conduct. *See Berry v. Mullin (In re Mullin)*, 91 B.R. 175 (Bkrtcy.S.D.Fla.1988). *See also Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir.1937). Further, a defalcation may be found where a debtor has misapplied funds held by him under the belief that he was authorized to do so. *See American Insurance Co. v. Lucas*, 41 B.R. 923 (W.D.Pa.1984).

Curtis Burgess has committed defalcation while acting in a fiduciary capacity with respect to $97,093.00 of Estella Burgess. Specifically, Curtis Burgess is liable to the Conservator of Estella Burgess for the following debts which arose due to his defalcation:

$ 2,283.00 – IRS Check (Transaction 1, above)
$   530.00 – IRS Check (Transaction 1, above)
$11,775.00 – Auction Proceeds (Transaction 2, above)
$62,505.00 – Proceeds of Certificates of Deposit (Transaction 4, above)
$10,000.00 – Gift to Himself (Transaction 5, above)
$10,000.00 – Gift to His Wife (Transaction 6, above)

■ Roberta Burgess did not act in a fiduciary capacity. Thus, she is not barred from discharge "for fraud or defalcation while acting in a fiduciary capacity" under § 523(a)(4). The evidence does not suggest that she is liable for the acts or omissions of her husband Curtis Burgess. She has no vicarious liability for the liabilities of her husband. There is no evidence that he acted on her behalf or as her agent. However, Roberta Burgess drafted checks in the amount of $31,575 on the Special Account of Estella Burgess. If these acts constitute embezzlement or larceny, her discharge would barred as to the resulting debt pursuant to § 523(a)(4). Under this section, debts arising from larceny are excepted from discharge whether or not the debtor acted in a fiduciary capacity. *See In re Schultz*, 46 B.R. at 889.

*Exception for Embezzlement*

■ I conclude that Curtis Burgess not only committed defalcation while acting in a fiduciary capacity, but also embezzled certain funds of Estella Burgess. Embezzlement has been defined as the "fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Schultz*, 46 B.R. at 880. *See also In re Belfry*, 862 F.2d 661, 662 (8th Cir.1988) (quoting *In re Schultz* with approval). Three elements must be present to support a finding of embezzlement: (1) property of another was entrusted to the debtor; (2) the debtor appropriated the property for a use other than that for which it was entrusted; and (3) the circumstances indicate fraud. *See In re Schultz*, 46 B.R. at 889.

■ I find that Curtis Burgess embezzled $97,093.00 belonging to Estella Burgess. Specifically, Curtis embezzled the following amounts from Estella Burgess:

$ 2,283.00 – IRS Check (Transaction 1, above)
$   530.00 – IRS Check (Transaction 1, above)
$11,775.00 – Auction Proceeds (Transaction 2, above)
$62,505.00 – Proceeds of Certificates of Deposit (Transaction 4, above)
$10,000.00 – Gift to Himself (Transaction 5, above)
$10,000.00 – Gift to His Wife (Transaction 6, above)

First, all of the property entrusted to Curtis under the power of attorney belonged to his mother, Estella Burgess. All of the above funds lawfully came into the hands of, or under the control of, Curtis Burgess. He held the general power of attorney of Estella Burgess, and he was broadly authorized to manage and control the use and disposition of the funds.

Second, Curtis appropriated the funds for the personal benefit of himself and his wife. Curtis transferred funds from the Special Account of Estella Burgess to the Burgess Farms Account. These transfers were unauthorized and the funds were used for the personal benefit of Curtis and his wife Roberta Burgess.

Third, I conclude that the appropriation of these funds was fraudulent. Curtis Burgess has not accounted for the use and disposition of the funds in any detail. Curtis did not have authority under the power of attorney to make gifts of the assets of Estella Burgess. He did not have authority to commingle the assets of Estella Burgess with the assets of Burgess Farms. Yet, he knowingly and willfully appropriated the assets of Estella and transferred the assets to himself, to his wife, and into the Burgess Farms Account. Curtis Burgess had limited discretion in dealing with the assets of Estella Burgess. Curtis' discretion was limited by the power of attorney. He acted beyond the scope of authority provided by the power of attorney and appropriated these funds for his own use. Curtis' conduct amounted to fraudulent appropriation of the property of Estella Burgess. Therefore, I conclude that Curtis Burgess embezzled the funds set forth in transactions 1, 2, 4, 5, and 6 above.

■ With respect to Roberta Burgess, I conclude that Roberta Burgess did not embezzle any funds of Estella Burgess. An essential element of embezzlement is that the property appropriated be in lawful possession of the person accused of committing the embezzlement. There is no evidence on which I can conclude that Roberta Burgess had lawful authority to possess or appropriate the property of Estella Burgess. Therefore, I conclude that Roberta

Burgess did not embezzle property belonging to Estella Burgess.

*Exception for Larceny*

■ I conclude that Curtis Burgess did not commit larceny with respect to the property of Estella Burgess. Larceny is the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner. *See Great American Insurance Co. v. Graziano (In re Graziano)*, 35 B.R. 589 (Bkrtcy.E.D.N.Y.1983); *3 Collier on Bankruptcy,* ¶ 523.14 (15th ed.1979). The essential difference between larceny and embezzlement is the manner in which property comes into the possession of the person charged. Embezzlement involves a lawful or authorized possession. In the case of larceny, however, the original taking and possession is unlawful. As the original taking and possession of Estella Burgess' property by Curtis Burgess was not unlawful, I conclude that Curtis Burgess did not commit larceny with respect to the property of Estella Burgess.

■ However, Roberta Burgess committed larceny when she drew six checks on the Special Account of Estella Burgess in the aggregate amount of $31,575. Roberta had no authority to draft checks on this account and she did it willfully and knowingly. Her original taking was therefore unlawful. Further, Roberta transferred these funds to herself, her husband, and into the Burgess Farms Account.

Based on the reasons set forth, I conclude that the debt of Curtis Burgess to Estella Burgess in the amount of $97,093 should not be discharged, and the debt of Roberta Burgess to the Estate of Estella Burgess in the amount of $31,575 should not be discharged.

A separate order will be entered consistent herewith.